Lennox, Appellant, *v.* Clark, Appellant.

356

358

Argued November 25, 1952. Before Stern, C. J., Stearne, Jones, Bell, Chidsey and Musmanno, JJ.

Rearguments refused January 26, 1953.

*Grover C. Ladner,* for all appellants hereinafter recited, with him *Joseph E. Gold* and *Francis X. McClanaghan,* for Sheriff, *Herbert S. Levin,* for County Commissioners, *Benjamin R. Donolow,* for Recorder of Deeds, *Henry M. Dubbs, Jr.,* for Clerk of Quarter Sessions and *M. Phillip Freed,* for Coroner.

*Grover C. Ladner* and *Ethan Allen Doty,* for Register of Wills.

*Nochem S. Winnet,* with him *Charles M. Solomon, Fox, Rothschild, O'Brien & Frankel, Joseph H. Lieberman* and *Michael J. Matta,* for Board of Revision of Taxes and Registration Commission, appellees.

*D. Barlow Burke,* for Prothonotary, appellee.

*Abraham L. Freedman,* City Solicitor, with him *Robert M. Landis,* First Deputy City Solicitor, for defendants.

*Eric A. McCouch,* with him *Wm. Barclay Lex,* for Committee of Seventy, amicus curiae.

*Marshall H. Morgan,* for interested parties, under Rule 46.

OPINION BY MR. CHIEF JUSTICE HORACE STERN, January 5, 1953:

Broadly speaking, we are here called upon to decide the effect wrought upon the officers and employes of the former Philadelphia county offices by the City-County Consolidation Amendment of the Constitution (adding section 8 to Article XIV thereof), the First Class City Home Rule Act of April 21, 1949, P. L. 665, and the Philadelphia Home Rule Charter adopted by the electors April 17, 1951, effective January 7, 1952. In the study of the problems involved we have been greatly aided by the comprehensive opinion filed by Judge MILNER on behalf of the court below, with some,

but not all, of whose conclusions we agree. The appeals here presented concern the offices of the Sheriff, Register of Wills, County Commissioners, Recorder of Deeds, Clerk of the Court of Oyer and Terminer and Quarter Sessions of the Peace, Coroner, Prothonotary of the Courts of Common Pleas, Board of Revision of Taxes and Registration Commission. Because certain special factors require consideration in the case of the Prothonotary, the Register of Wills, the Board of Revision of Taxes and the Registration Commission, we shall initially confine this discussion to the appeals dealing with the other offices named.

The City Solicitor has urged upon us the extreme importance of a prompt disposition of these cases in view of the fact that the Home Rule Charter provides (section A-104) that employes of any governmental agency becoming employes of the city by virtue of the City-County Consolidation Amendment and the enactment of any legislation required by such amendment, who were not appointed after civil service test and certification shall be continued in their respective positions provided that within one year after the Charter takes effect or within one year after such constitutional amendment and legislation become effective they pass a qualifying test prescribed by the Personnel Director and approved by the Civil Service Commission. We held in *Carrow v. Philadelphia*, 371 Pa. 255, 89 A. 2d 496, that such employes were entitled to retention in service until afforded the opportunity to pass such qualifying test. It is our judgment that the year governing is the one that began with the effective date of the Charter, January 7, 1952, but that the time thus fixed was directory, not mandatory, and that the employes concerned cannot be deprived of their right to take the test either because of the failure of the proper authorities to conduct the necessary examinations or because of any pre-existing uncertainty as to the law,

and that, therefore, a further reasonable period of time must be allowed such employes for that purpose.

Notwithstanding the consolidation of the city effected by the Act of February 2, 1854, P. L. 21, the structure of the government of Philadelphia continually grew more and more complex and ultimately completely outmoded. Instead of a unified system there existed dual governments. Entirely different rules and regulations prevailed in the city and the county offices; in the one the employes were under civil service, in the other they were appointed without any examination as to their qualifications; in the one they were barred from political activities, in the other they were wholly unrestricted in that respect; in the one the officers were compelled to seek their legal advice from the City Solicitor, in the other they were allowed to have their own counsel. These anomalies flourished in spite of the fact that all the offices and departments, city and county, participated in the government of the same compact area and its inhabitants. Moreover, the personnel of the county offices were paid, after the Consolidation Act of 1854, not out of any county treasury, for none such existed, but by the city, and their salaries and wages were, except in the case of elected officers, fixed and determined by the city council: (Act of May 2, 1945, P. L. 375, as amended by the Act of May 2, 1947, P. L. 134). It is no wonder, therefore, that over a great number of years there has been considerable popular agitation for the correction of this patch-work system and its uneconomic division of functions, and it was presumably in response to that agitation that the City-County Consolidation Amendment, the First Class City Home Rule Act and the Home Rule Charter came into being, bringing in their train the problems that have given rise to the present appeals.

The specific issues with which we are here confronted are these: (1) whether the civil service pro

visions of the Charter now apply to the employes of the former county offices; (2) whether the Charter prohibitions against political activities by officers and employes of the city now extend to officers and employes of the former county offices; (3) whether the former county officers now are subject to the Charter prohibition against the appointment of private solicitors to serve them in their official capacities; (4) whether the former county officers are now bound by the mandate of the Charter to give the information prescribed therein to the Director of Finance, the City Controller and the Personnel Director. Or whether, as to all these matters, further legislation by the General Assembly or the City Council is necessary to effect those results. The manner in which these questions are raised is by complaints in equity filed by the former county officers against the named city officials for injunctions to restrain the latter from attempting to apply to the plaintiffs these various provisions of the Charter; in the case of the Board of Revision of Taxes and the Registration Commission the proceeding is by petition for declaratory judgment.

We said in the *Carrow* case that the solution of the legal problem there presented was entirely free from difficulty if the controlling enactments were read with an eye to their plain and unequivocal meaning instead of with a straining after forced constructions and a seeking of ambiguities. In large measure that same statement is applicable here. There seems to be much needless confusion prevailing in many quarters as to what has been accomplished in the way of consolidation of the city and county governments and what still remains to be done in that direction if the complete purpose of the proponents and sponsors of the reform of the Philadelphia governmental structure is to be brought to fruition. It is believed that all such confusion would be immediately dissipated if two impor-

tant distinctions were kept clearly in mind,—the one between the effect of the consolidation on the *personnel* of the county offices and its effect on the *duties* or *functions* performed by such offices, and the other between the consolidation of the city and county governments and the proposed "streamlining" of the city government following that consolidation. These distinctions, it is hoped, will become entirely clear in the course of this discussion.

We start with the City-County Consolidation Amendment itself. It provides in clause (1) that "In Philadelphia all county offices are hereby abolished, and the city shall henceforth perform all functions of county government within its area through officers selected in such manner as may be provided by law." The crucial words there to be noted are *"hereby"* and *"henceforth."* The county offices are abolished, not at some indefinite time in the future when a legislative body might so enact, but *"hereby,"* that is, by virtue of the constitutional amendment itself, which in this respect, therefore, is obviously self-executing. It will be further noted that all the functions of county government, that is to say, all the activities or duties theretofore performed by the county officers, are *thenceforth* to be performed by the city; the city is to take over *then and there,* as part of its own government, the performance of the functions of the county government. This provision also is clearly self-executing. Clause (6) of the amendment provides: "This amendment shall become effective *immediately upon its adoption."* Clause (7) provides that "Upon adoption of this amendment all county officers shall become officers of the city of Philadelphia." Here again the amendment is manifestly self-executing, for the change from county to city officers is to take place *upon adoption of the amendment*—which, incidentally, occurred on November 6,

1951—and therefore without the necessity of any further action, legislative or otherwise. Thus the county offices were effectually brought into the structure of the municipal government. And of course, when the county officers became city officers their employes automatically became thereby city employes.[1] It is true that clause (7) further states that "until the General Assembly shall otherwise provide," the county officers [having now become officers of the City of Philadelphia] "shall continue to perform their duties and be elected, appointed, compensated and organized in such manner as may be provided by the provisions of this Constitution and the laws of the Commonwealth in effect at the time this amendment becomes effective, . . .". In other words the county, now city, officers were to carry on their duties or functions just as before the transformation took place and until such *duties* or *functions* should be changed by legislative action. But this provision obviously did not purport to deal with the effect of the change from county to city status on the *personnel* of the county offices,—an entirely different question from that of the continued operation of the functions or duties imposed on them by then existing law.

What then was the effect on such personnel of the categorical abolition of the county offices and the transformation of county officers into officers of the City of

---

[1] Section A-104 of the Home Rule Charter was made applicable by its provisions to those who "may become employees of the City by virtue of amendment of the Constitution of the Commonwealth of Pennsylvania and the enactment of any legislation required by such amendment." In holding in the *Carrow* case that the employes of former county offices had become city employes and were entitled to the rights conferred upon them by that section we intended to hold, and in reaching that conclusion necessarily did hold, that the amendment was in this respect self-executing and did not require the enactment of any legislation.

Philadelphia with the consequent change of their employes from county to city employes? Plaintiffs, the former county officers, contend that those changes effected nothing more than one of nomenclature, referring, in support of that proposition, to the cases of *Taggart v. Commonwealth of Pennsylvania,* 102 Pa. 354, which dealt with the City Controller, and *Commonwealth v. R. G. Oellers,* 140 Pa. 457, 21 A. 1085, which dealt with the City Treasurer. So far, however, from those authorities justifying the contention, they would seem to lead to exactly the opposite conclusion, inasmuch as they held that those officers having been designated by the Act of February 2, 1854, P. L. 21, as city officers but by Article XIV, section 1 of the Constitution of 1874 as county officers, the change thus effected was one *not* merely of names, but that, now as county officers, they had become subject to the law governing the filling of vacancies in county offices as distinguished from the law applicable to the filling of vacancies in city offices. In the *Taggart* case it was expressly said (p. 364) : "In determining what class of officials should be designated county officers, the [constitutional] convention manifestly had in view those whose duties were co-extensive with the boundaries of the county, and the character of the duties which they performed, rather than the names by which they were called. The purpose was to deal with duties, using names so far only as to indicate the objects to be attained."

Apart from precedents either pro or con, it would be wholly incredible to suppose that the only accomplishment intended by the City-County Consolidation Amendment was the merely puerile one of a change of titles, and that for such a superficial purpose alone two successive legislatures voted upon the amendment and the citizens of the Commonwealth adopted it at a State-wide election! Certainly something more substantial

was intended to be wrought by its enactment. Its real and designed result was that, when the former county officers became city officers and the former county employes city employes, they automatically became subject thereby to the laws then in effect governing and regulating city officers and employes, and also, of course, to any such laws as might thereafter become effective: (cf. *Davis v. Carbon County*, 369 Pa. 322, 330, 85 A. 2d 862, 867).

What, then were the laws applicable to the particular questions here involved that were in force on November 6, 1951, when, by virtue of the adoption of the City-County Constitutional Amendment, the county officers and employes became officers and employes of the city? They were the laws contained in the First Class City Act of June 25, 1919, P. L. 581. Article XIX, section 1 of that act provided that all appointments, promotions, reductions, suspensions, removals, and dismissals in the civil service of the city should be made in accordance with the civil service provisions of that article and the rules prescribed thereunder. Section 23 of Article XIX prohibited the participation of any officer, clerk or employe of the city or of any department, trust, or commission thereof, in certain political activities there enumerated. Article XIII, section 3 (a) provided that the City Solicitor should be the legal adviser and act as attorney and counsel for the city, for all branches of the city government, and for all departments and officers of the city, and section 5 provided that no department of the city should employ any other solicitor, except that assistant counsel might be employed in any particular matter or cause by the mayor, with the consent of the council, but he should be selected by the city solicitor.

These provisions of the 1919 Act, in force on November 6, 1951, were quickly superseded by the provisions

on these same subjects contained in the Home Rule Charter,[2] which, duly authorized by the legislature and adopted by the vote of the Philadelphia electorate, became effective on January 7, 1952.[3] Section 7-301 of the Charter provided that all officers and employes of the city, all departments, all independent boards and commissions and all departmental boards and commissions should, with certain exceptions, be under civil service. Section 7-302(1) provided that all officers and employes of the city should comply with and aid in all proper ways in carrying out the civil service regulations and should furnish any records or information which the Personnel Director or the Civil Service Commission might request. Section 8-103 provided that it was the duty of each officer or department and each independent board and commission of the city and every other agency of any kind desiring appropriations from the Council to comply with all requests made by the Director of Finance for information dealing with the budget. Section 8-104 provided that each department, board and commission of the city and every other agency receiving an appropriation from the City Treasury should transmit to the City Controller, the Director of Finance, and the Personnel Director, certain infor-

[2] Section 11 of the Home Rule Act provided that so far as the provisions of the charter "are consistent with the grant of powers and the limitations, restrictions and regulations hereinafter prescribed, they shall supersede any existing charter and all acts or parts of acts, local, special, or general, affecting the organization, government and powers of such city, to the extent that they are inconsistent or in conflict therewith. All existing acts or parts of acts and ordinances affecting the organization, government and powers of the city, not inconsistent or in conflict with the organic law so adopted, shall remain in full force."

[3] Section 11 of the Home Rule Act provided that the charter was to become the organic law of the city at such time as might be fixed therein.

mation in regard to their officers and employes. Section 10-107, clauses (3), (4) and (5) forbade the appointed officers, and the employes of the city or of any governmental agency whose compensation was paid from the City Treasury, from engaging in any of the political activities therein specified, and *all* city officers from engaging in certain of those activities. Section 4-400(a) provided that the Law Department of the city should have the power and duty of furnishing legal advice to all officers, departments, boards and commissions concerning any matter or thing arising in connection with the exercise of their official powers or performance of their official duties, and section 8-410 provided that whenever any officer, department, board or commission should require legal advice concerning his or its official business, it should be the duty of such officer, department, board or commission to refer the same to the Law Department, and to follow the advice so received; having followed such advice the officer would be relieved from liability for so doing upon his official bond or otherwise; it was made unlawful for any officer, department, board or commission to engage any attorney to represent him or it in any matter or thing relating to his or its public business without the approval of the City Solicitor.

On January 7, 1952, therefore, *all* city officers and employes became immediately subject to these provisions of the Charter, except that the former county employes were afforded by section A-104 of the Charter the privilege of taking a qualifying test to satisfy civil service requirements. Of course, any persons employed by former county offices after the adoption of the City-County Consolidation Amendment on November 6, 1951, were, from the very beginning of their employment, city employes, and as such became subject, when the Charter went into effect on January 7, 1952, to all its

provisions in reference to city employes, just as all other then existing city employes became so subject.

Incidentally it may be observed that the requirement that all the city departments should rely upon the City Solicitor for advice is obviously a wise one,[4] since it is important that there be a unified, consistent interpretation of legal problems arising under the administration of the city government, which might not be the case if there were individual solicitors for the different departments.

Some point has been made of the fact that the former county officers in a few instances performed certain duties on behalf of the Commonwealth and to that extent were acting in the capacity of an officer, agent or employe of the State: *Philadelphia v. Martin,* 125 Pa. 583, 17 A. 507; *Knisely v. Cotterel,* 196 Pa. 614, 633, 46 A. 861, 864; *Philadelphia v. McMichael,* 208 Pa. 297, 57 A. 705; *Luzerne County v. Morgan,* 263 Pa. 458, 107 A. 17. However, just as the rendition of that service did not militate against their general status as *county* officers, so now its continued rendition does not conflict with their general status as *city* officers.

The court below held that the civil service provisions of the Charter were applicable to former county officers and their employes, that the Charter prohibitions against their political activities were also applicable, and that the officers were bound to supply the information required by sections 8-103 and 8-104. In all these respects we are in accord with its decision. We are not in accord, however, for the reasons hereinbefore stated, with its conclusion that the former county officers were not bound by sections 4-400(a) and 8-410, requiring them to obtain their legal advice exclusively from the Law Department of the city.

---

[4] It had been so provided even as early as the Act of June 1, 1885, P. L. 37, Article VIII, section 1 (III).

As far, then, as what may be termed the *inter* city-county consolidation is concerned, it is a case of so far, so good. The one phase is completed in that the county offices are now a part of the municipal government and that all their officers and employes are now city officers and employes and as such bound by the provisions of the Charter concerning such officers and employes. But their *activities* or *functions* are not changed; they will operate just the same as before and continue to perform their present duties until the next stage of the project is entered upon, which is to accomplish what may be termed the *intra* city consolidation, that is, the reorganization or "streamlining" of the municipal governmental structure, now enlarged by the acquisition of the former county offices. Since clause (7) of the City-County Consolidation Amendment provides that the county officers are to continue, now as city officers, to perform their duties "until the General Assembly shall otherwise provide," it would seem that any proposed reorganizations, regroupings, abolitions, or mergers, of the former county offices, designed the more advantageously to incorporate their functions into the existing municipal structure, must wait upon action by the General Assembly. Whether, however, the legislature has already abrogated its power in that regard and vested it exclusively in the city by the provisions of Article II, section 17, of the Home Rule Act or otherwise, is a question not involved in the present appeals, and as to which, therefore, we express no opinion.

This brings us to consideration of the appeals involving the offices of the Prothonotary of the Courts of Common Pleas and the Register of Wills, which require individual treatment because of the fact that they are each the subject of a special provision of the Constitution, and also because they are so closely integrated in the judicial branch of the government. As to the

Prothonotary, it is provided in Article V, section 7 of the Constitution that "For Philadelphia there shall be one prothonotary's office, and one prothonotary for all said courts, to be appointed by the judges of said courts, . . .; the said prothonotary shall appoint such assistants as may be necessary and authorized by said courts; . . . ." While it is true that by Article XIV, section 1, of the Constitution, the prothonotary is designated as a county officer, and that clause (7) of the City-County Consolidation Amendment provides that upon its adoption all county officers should become officers of the City of Philadelphia, the question arises whether, in view of Article V, section 7, the Prothonotary should be considered a county officer *within the intendment* of the City-County Consolidation Amendment. It is an established principle of constitutional construction that, where a conflict exists between a specific constitutional provision which is applicable to a particular case and certain general provisions which, were it not for such conflict, might apply, the specific provision will prevail: *Philadelphia v. Commonwealth,* 270 Pa. 353, 358, 359, 113 A. 661, 662; *Commonwealth ex rel. v. Kline,* 294 Pa. 562, 567, 144 A. 750, 751. Here, such a conflict does exist because, if the provision of the City-County Consolidation Amendment were to be deemed applicable to the Prothonotary, clause (7) thereof would enable the General Assembly or the City Council, as the case may be, so to emasculate his functions as practically to abolish his office altogether, and, while presumably such extreme power would not be lightly exercised, its mere existence would constitute an encroachment upon the independence and the functioning of the judiciary. Furthermore, since the Prothonotary is authorized by Article 5, section 7, to appoint such assistants as may be necessary and authorized by the courts, that authority, if it were to be circumscribed by such regulations as the Civil Service Commission might

see fit to apply, could conceivably be impaired or even wholly nullified. Nor do we see any basis for the distinction made by the court below in regard to appointments of certain deputies or assistants specified in legislative acts implementing the constitutionally conferred authority. It is because of the constitutional status specially given the Prothonotary (as distinguished from the Clerk of Quarter Sessions, who is not specifically referred to in the judiciary article of the Constitution, apparently because his office was not regarded as so essential to the functioning of the judicial system as to constitute a fundamental part thereof), that we are led to conclude that the office of the Prothonotary does not fall within the scope of the City-County Consolidation Amendment, and that therefore, not being transformed into a city office, it has not become subject to the provisions of the Charter.

The same considerations thus applicable to the office of the Prothonotary apply with equal, if not greater, force to that of the Register of Wills, since it has been held that he is a judge and that his probate of wills constitutes a judicial act: *Sebik's Estate,* 300 Pa. 45, 47, 150 A. 101, 102; *West, Admrx., v. Young,* 332 Pa. 248, 251, 2 A. 2d 745, 746; *Szmahl's Estate,* 335 Pa. 89, 92, 93, 6 A. 2d 267, 269. He too is the subject of a specific provision in the Constitution. Article V, section 22, provides that "In any county in which a separate orphans' court shall be established, the register of wills shall be clerk of such court and subject to its directions, in all matters pertaining to his office; he may appoint assistant clerks, but only with the consent and approval of said court." Accordingly it is our opinion that the office of the Register of Wills was not converted by the City-County Consolidation Amendment into a city office and therefore has not become subject to the provisions of the Charter.

We pass to the questions involved in the appeals concerning the offices of the Board of Revision of Taxes and the Registration Commission.

The Board of Revision of Taxes is not referred to in the Constitution at all. In Philadelphia it was created by the Act of March 14, 1865, P. L. 320 and is now governed by the Act of June 27, 1939, P. L. 1199. Is it a county office? Its members now contend that it is a State Agency, and therefore is not affected by the City-County Consolidation Amendment. They seek support for this contention in the fact, first, that it is not named as a county office in Article XIV, section 1 of the Constitution nor are its members elected under the provision of section 2 but are appointed by the judges of the courts of common pleas; and, second, that previous opinions of this court have stated that it is not a county office. As to its not being listed as a county office in Article XIV, section 1, it would seem sufficient to say that, being a form of organization not common to all the counties of the Commonwealth, its inclusion in that enumeration would scarcely have been in order, the classification there made being presumably intended to refer only to those officers who functioned in *every* county. As to section 2, it would seem clear that its reference is only to those officers enumerated in section 1.[5] As to the references in prior opinions of this court to the Board of Revision of Taxes as not being a county office, the cases in which such references occurred arose in periods when the duties to be performed by the Board were, not for the county

[5] While section 2 provides that "County officers shall be elected at the municipal elections," not all those who are declared in section 1 to be county officers are so elected. The Prothonotary in Philadelphia is appointed by the judges (Article V, section 7), as are also the "clerks of the courts" other than the Clerk of Quarter Sessions.

alone, but very largely for the State as well. Thus, in *Commonwealth v. Collier*, 213 Pa. 138, 62 A. 567, referred to in *Suermann v. Hadley, Treasurer*, 327 Pa. 190, 208, 193 A. 645, 655, the holding of the court that the Board for the Assessment and Revision of Taxes in that case (which had been established for a certain class of counties by the Act of March 24, 1905, P. L. 47) did not constitute a county office, was based upon the fact that the Board was entrusted with the duty of making assessments and valuations of property taxable for both State and county purposes; indeed the court there said (p. 141, A. p. 568) that "The appointment of the board is primarily for the state as well as for the county, and though the former looks to the latter for the payment to it of a certain tax, the legislature does not permit the county through its township and ward assessors to assess and value property upon which the state tax has been imposed, but directs that this board shall be appointed *for that specific purpose.*" In *Selig v. Philadelphia*, 232 Pa. 309, 314, 81 A. 308, 310, it was said that the city had no power "over the assessors or the board of revision on questions affecting the assessment of subjects of taxation in which the state alone is concerned to the exclusion of the city"; there too the assessments and valuations made by the Board were in connection with state and county taxes alike. In the very *Suermann* case above referred to, it was said (p. 201, A. p. 652) that the finding by the Board of Revision of Taxes of the base on which the levy of the tax was to be applied was an executive function "delegated to a *municipal* agency." In the latest case in which the question has been raised, *Clark v. Meade*, 369 Pa. 409, 85 A. 2d 169, we held that the Controller of the City and County of Philadelphia had the authority to examine the records of the Board of Revision of Taxes of the County of Philadelphia, and in the course of the opinion of Mr. Chief Justice DREW in that case it was

said (p. 412, A. pp. 170, 171) : ". . . it cannot seriously be argued that the Board is not concerned with the fiscal affairs of the County. One of the principal sources of revenue of both the City and County is the taxation of real and personal property. . . . Thus the assessments made by the Board are the initial step in the whole process of taxation and it is axiomatic that taxation is the basis for the whole fiscal structure of the City and County."

When we come to view the subject on the basis of history, reason and logic, it is abundantly clear that the Board of Revision of Taxes of Philadelphia is a county office. The boards of revision originally established for all the counties of the State were composed of the county commissioners and associate judges of each county: Act of July 27, 1842, P. L. 441, section 10.[6] In counties of the second class, by the Act of June 21, 1939, P. L. 626, the members of the Board of Property Assessment, Appeals and Review are now appointed by county commissioners; in counties of the third class, by the Act of June 26, 1931, P. L. 1379, the members of the Board for the Assessment and Revision of Taxes are also appointed by the county commissioners; in counties of the fourth, fifth, sixth, seventh and eighth classes the Board of Assessment and Revision of Taxes, by the Act of May 21, 1943, P. L. 571, are composed of the county commissioners themselves. In *Commonwealth ex rel. Smillie v. McElwee*, 327 Pa. 148, 193 A. 628, it was accordingly pointed out (p. 156, A. p. 632) that in sixty of the sixty-seven counties of the State the assessment of property is in the hands of the county

---

[6] In Philadelphia by the Consolidation Act of 1854, this was modified by the provision (section 13) that the city commissioners, together with the city treasurer and receiver of taxes, were to perform the duties of a county board of revision, according to the laws in force in other counties of the Commonwealth.

commissioners, and in six counties the assessments are made by a board appointed by the county commissioners, so that in all the counties of the State other than Philadelphia the assessment of property has thus been directly recognized by the legislature as being purely a county function. By what process of reasoning, therefore, is it conceivable that the same function carried on in Philadelphia is in any respect different as to its county status from that of the similar boards in all the other counties? The State long since became unconcerned with county assessments of property as the basis of any State tax. Performing, therefore, a purely local function upon which the entire fiscal system of Philadelphia is dependent, there is no ground whatever for viewing the Board other than as a county office, and, as such, transformed by the City-County Consolidation Amendment into a city office. Certainly the mere fact that it was specifically established by an act of the legislature does not make it a State agency; all non-constitutional offices are necessarily so created.

In the Home Rule Act, section 18, it is provided that "Notwithstanding the grant of powers contained in this act, no city shall exercise powers contrary to, or in limitation or enlargement of, powers granted by acts of the General Assembly which are—(a) Applicable to a class or classes of cities on the following subjects: . . . (9) Providing for the assessment of real or personal property and persons for taxation purposes." It is argued that because of this provision the city can exercise no power of any kind over the Board of Revision of Taxes. Such a contention scarcely merits discussion. What was obviously intended by that provision of the statute was that the city should not have the power to legislate in regard to the substantive rules governing the making of assessments and valuations of property. For example, the city cannot change the provision of section 13 of the Act of 1939 (under which the Board

now operates) that all taxable property shall be valued and assessed by the assessors and by the board at the actual value thereof, in determining which the price for which it would bona fide sell shall be considered but not be controlling. But the provision of the Home Rule Act in question makes no reference whatever to the *personnel* of the Board and effects no limitation of the powers of the city in regard thereto.

It follows from what has been said that the Board of Revision of Taxes of Philadelphia is, in our opinion, a county office which came within the scope of the City-County Consolidation Amendment, that its members have accordingly become city officers, that its employes are now city employes, and that, as such officers and employes, they are subject to the provisions of the Charter.

All considerations thus applying to the Board of Revision of Taxes apply even more forcefully to the Registration Commission. Like the Board of Revision of Taxes the Registration Commission is not referred to in the Constitution. It was created by the Act of March 30, 1937, P. L. 115, the title of which is "The First Class City Permanent Registration Act"; it gave the Commission "jurisdiction over the registration of electors of such city." The Registration Commission is no more a State agency than is the Board of Revision of Taxes. In cities of the second class (Act of May 25, 1937, P. L. 814) and in cities of the second class A (Act of June 1, 1937, P. L. 1132) there are also registration commissions, the members of which, like those of the Registration Commission in Philadelphia, are appointed by the Governor, but in cities of the third class (Act of May 25, 1937, P. L. 849) and in boroughs, towns and townships (Act of April 29, 1937, P. L. 487) the registration commissions consist of the county commissioners themselves in each county. Article VIII, section 7 of

the Constitution provides that whereas laws for the registration of electors shall be uniform throughout the State, such laws may be enacted to apply to cities only, provided that such laws be uniform for cities of the same class. The Registration Commission in Philadelphia is a purely city agency. Plaintiffs contend that the members and employes of the Commission are not subject to the provisions of the Charter because, by Section 18 of the Home Rule Act, the city is forbidden to exercise powers contrary to, or in limitation or enlargement of, powers granted by acts of the General Assembly which are—(a) Applicable to a class or classes of cities on the following subjects: ". . . (7) providing for the personal registration of electors." There is no merit in this argument. The provision in question means merely that the city cannot, for example, amend or nullify general laws of the State regarding the qualifications which entitle an elector to be registered, or laws concerning, not the *personnel* of the office of the Registration Commission, but the *functions* or *duties* they perform—laws in force throughout the entire Commonwealth. We conclude, therefore, that the members of the Registration Commission are city officers, that their employes are city employes, and that members and employes alike are bound by the provisions of the Charter.

There seems to exist an erroneous impression on the part of the plaintiffs in all these actions regarding section 18 of the Home Rule Act which forbids the city to exercise powers contrary to powers granted by acts of the General Assembly applicable in every part of the Commonwealth or to all the cities of the Commonwealth. It is argued that because plaintiffs perform their respective functions and duties in pursuance of general laws which impose similar or identical duties upon officers holding corresponding positions throughout the Commonwealth, the city is thereby shorn of all

power to interfere with them or their employes. Nothing could be further from the truth, it being abundantly clear that the limitations of power referred to in section 18 concern only laws in relation to substantive matters of State-wide concern, such as the health, safety, security and general welfare of all the inhabitants of the State, and not to matters affecting merely the *personnel* and *administration* of the offices local to Philadelphia and which are of no concern to citizens elsewhere. Any other conclusion would reduce the Charter to a mere scrap of paper and make the much heralded grant of Philadelphia home rule an illusion and a nullity.

Because, then, of the reasons hereinbefore stated, we make the following

ORDER

1. In Appeals Nos. 102 and 105 (Sheriff), Nos. 98 and 106 (County Commissioners), and Nos. 100 and 104 (Recorder of Deeds), the decrees of the Court below are reversed and plaintiff's complaints in equity are dismissed.

2. In Appeals Nos. 99 (Clerk of the Court of Oyer and Terminer and Quarter Sessions of the Peace) and No. 101 (Coroner), the decrees of the court below are affirmed.

3. In Appeals Nos. 97 and 103 (Register of Wills) the decree of the court below is modified to read as follows:

"It is hereby ORDERED, ADJUDGED and DECREED that a perpetual injunction issue restraining the defendants, their subordinates, agents and employees, and each of them, from in any manner enforcing or attempting to enforce any of the provisions contained in sections 4-400 (a) and 8-410 of the Philadelphia Home Rule Charter as applying to the plaintiff and his office, and from in any manner enforcing or attempting to enforce any of the provisions contained

in sections 7-302(1), A-104, 10-107(3) and 10-107 (4) of the said Charter as applying to plaintiff's subordinates, agents, assistants and employees." As thus modified the decree is affirmed.

4. In Appeal No. 108 (Prothonotary), the decree of the court below is modified to read as follows:

"It is hereby ORDERED, ADJUDGED and DE-CREED that a perpetual injunction issue restraining the defendants, their subordinates, agents and employees, and each of them, from in any manner enforcing or attempting to enforce any of the provisions contained in sections 4-400(a) and 8-410 of the Philadelphia Home Rule Charter, as applying to plaintiff and his office, and from in any manner enforcing or attempting to enforce any of the provisions contained in sections 7-302(1), A-104, 10-107(3) and 10-107(4) of the Charter as applying to plaintiff's subordinates, deputies, assistants, agents and employees." As thus modified the decree is affirmed.

In Appeal No. 107 (Board of Revision of Taxes and Registration Commission), the declaratory judgment of the court below is reversed and judgment is now entered as follows:

"It is hereby ORDERED, ADJUDGED and DE-CLARED that sections 4-400(a), 7-302(1), 8-103, 8-104, 8-410 and 10-107 of the Philadelphia Home Rule Charter apply to, and are binding upon, the members of the Board of Revision of Taxes in and for the City and County of Philadelphia and the Registration Commission in and for the City of Philadelphia, and sections 7-301, 7-302(1), 10-107 and A-104 apply to, and are binding upon, the employees of each and both of those agencies."[7]

[7] The Members themselves of the Board of Revision of Taxes and the Registration Commission do not fall within the provision of section 7-301 of the Charter by reason of the exceptions therein

In all the appeals the parties to bear their respective costs.

---

OPINION CONCURRING IN PART AND DISSENTING IN PART BY MR. JUSTICE BELL:

The Constitution of Pennsylvania, Article XIV, §1, provides: "*County*\* officers shall consist of sheriffs, coroners, . . . recorder of deeds, commissioners, . . . clerks of the courts, district attorneys . . . ." In the light of this clear language it is difficult to understand how anyone could successfully contend that a sheriff, a coroner, a recorder of deeds, a county commissioner, or a clerk of courts, is not a county officer.

The City-County Consolidation Amendment—Article XIV, §8, which was proposed by Joint Resolution No. 4, 1949, P. L. 2139, and Joint Resolution No. 1, 1951, P. L. 2211, passed by two legislatures and adopted by the voters of Pennsylvania, provides:

"ARTICLE XIV
*County* Officers

Sec. 8. City and county of Philadelphia; consolidation of governmental functions; *county* offices abolished

(1) In Philadelphia *all county offices are hereby abolished, and the city shall henceforth perform all functions of county government*\* within its area through officers selected in such manner as may be provided by law.

(2) Local and special laws, regulating the affairs of the city of Philadelphia and creating offices or pre-

---

contained. Under the provision of clause 7 of the City-County Consolidation Amendment all employes of county offices serving on November 6, 1951, who had the legal status of "county officers" within the intendment of that clause, are entitled to complete their terms.

\* Italics throughout, ours.

scribing the powers and duties of officers of the city of Philadelphia, shall be valid notwithstanding the provisions of section seven of article three of this Constitution.

(3) All laws applicable to the county of Philadelphia shall apply to the city of Philadelphia.

(4) The city of Philadelphia shall have, assume and take over all powers, property, obligations and indebtedness of the county of Philadelphia.

(5) The provisions of article fifteen, section one of the Constitution shall apply with full force and effect to the functions of the county government hereafter to be performed by the city government.

(6) *This amendment shall become effective immediately upon its adoption.*

(7) Upon adoption of this amendment all county officers shall become officers of the city of Philadelphia, *and, until the General Assembly shall otherwise provide,* shall continue to perform their duties *and be elected, appointed, compensated and organized* in such manner as may be provided by the provisions of this Constitution and the laws of the Commonwealth in effect at the time this amendment becomes effective, but such officers serving when this amendment becomes effective shall be permitted to complete their terms. Amendment adopted at election Nov. 6, 1951."

The language of the Amendment and its meaning seem to us absolutely clear. In Philadelphia all county offices are abolished (not by some future legislative body, but) *by the Amendment itself.* The Amendment becomes effective, not at some future time, but *immediately.* Former county officers immediately became city officers and the city through these officers and their employes shall forthwith and until the General Assembly shall thereafter otherwise provide, continue to

---

* Italics throughout, ours.

perform their duties and all functions of county government. These provisions are clearly self-executing and, as we have seen, take effect immediately upon the adoption of the Amendment.

We agree with the majority of this Court which, in a very able opinion by the Chief Justice, hold (a) that the Sheriff's Office, the Coroner's Office, the County Commissioner's Office, the Office of the Recorder of Deeds, and the Office of the Clerk of the Courts were county offices; and (b) that the City-County Consolidation Amendment and The Philadelphia Home Rule Charter apply to them and make them now City offices; and (c) that the "real and designed result was that, when the former county officers became city officers and the former county employes city employes, they automatically became subject thereby to the laws then in effect governing and regulating city officers and employes, and also, of course, to any such laws as might thereafter become effective: (cf. Davis v. Carbon County, 369 Pa. 322, 330, 85 A. 2d 862, 867)." This is in accord with our decision in *Carrow v. Philadelphia,* 371 Pa. 255, 89 A. 2d 496.

Article XIV, §1, of the Constitution also includes as "county officers", "prothonotaries and registers of wills." However, the Register of Wills of Philadelphia County and the Prothonotary in Philadelphia are separately and *specifically* provided for under Article V of the Constitution entitled "The Judiciary". Section 7 of Article V provides: "For Philadelphia there shall be one prothonotary's office, and one prothonotary for all said courts, to be appointed by the judges of said courts, and to hold office for three years, subject to removal by a majority of the said judges; the said prothonotary shall appoint such assistants as may be necessary and authorized by said courts . . .".

Section 22 of Article V of the Constitution deals specifically with a register of wills in counties which

have a separate Orphans' Court, including of course Philadelphia County. It provides (inter alia) : "In any county in which a separate orphans' court shall be established, the register of wills shall be *clerk of such court and subject to its directions, in all matters pertaining to his office*; he may appoint assistant clerks, but *only with the consent and approval of said court*."

By the Act of June 20, 1919,* the Register of Wills is appointed statutory *agent of the Commonwealth* for the collection of inheritance taxes and the allowance of debts and proper deductions. Under the Register of Wills Act of June 28, 1951, ** *exclusive probate jurisdiction* is given to the Register of Wills. Even before the Act of 1951, a Register of Wills was held by this Court to be a Judge and his decisions in probate matters are judicial decisions which are unimpeachable except on appeal: *Sebik's Estate,* 300 Pa. 45, 150 A 101; *West v. Young,* 332 Pa. 248, 2 A. 2d 745; *Szmahl's Estate,* 335 Pa. 89, 6 A. 2d 267; *McNichol's Estate,* 282 Pa. 187, 127 A. 461.

It is clear from the foregoing provisions of the Constitution and the Acts of Assembly and the decisions of this Court that the Register of Wills is a quasi-judicial officer acting in the triple capacity of *Clerk of the Orphans' Court* of Philadelphia County, *Probate Judge,* and *Agent of the Commonwealth* of Pennsylvania for the collection of inheritance taxes. No municipal or county functions are performed by him in any of these offices.

The City-County Consolidation Amendment makes specific reference to Article III and Article XV of the Constitution, but does not refer to or expressly or impliedly amend the Judiciary Article of the Constitution; nor does the Charter Act refer to or mention the Regis-

---

* P. L. 521, Article 2, §21; 72 PS 2381.
** P. L. 638, 20 PS 1840-101.

ter of Wills or the Prothonotary or expressly or impliedly amend the aforesaid Acts.

The law is clearly settled that repeal by implication is not favored and will prevail only when the intent to repeal is clear: *Newton Estate*, 354 Pa. 146, 47 A. 2d 229; *Com. v. Provident Trust Co.*, 287 Pa. 251, 134 A. 377. No such intent is apparent; on the contrary the opposite intent appears.

It is well established that where ambiguity or conflict exists between a specific constitutional provision (or a specific provision of a statute) which is unquestionably applicable to a particular person or agency and certain general provision which would apply if it were not for such ambiguity or conflict, *the specific provision will prevail*: *Waits' Estate*, 336 Pa. 151, 154, 7 A. 2d 329; *Philadelphia v. Com.*, 270 Pa. 353, 358, 113 A. 661; *Buckley v. Holmes*, 259 Pa. 176, 188, 102 A. 497; *Com. v. Kline*, 294 Pa. 562, 567, 144 A. 750; Endlich, Interpretation of Statutes, §216.

It is clear, therefore, (a) that the City-County Consolidation Amendment, viz., §8, Article XIV of the Constitution does not expressly or by implication repeal §7 or §22 of Article V of the Constitution, and (b) that these provisions of Article V which deal specifically with the Register of Wills in Philadelphia and with the Prothonotary in Philadelphia prevail over the general provisions of Article XIV. For these reasons I fully agree with the majority that neither of these offices fall within or are governed by the Amendment or by the Charter.*

I disagree, however, with the majority in its decision with respect to the Board of Revision of Taxes and the Registration Commission. Their decision not only violates well-established principles of law, but also is contrary to all the prior decisions of this Court and to the

---

* Except to the limited extent hereinafter discussed.

First Class City Home Rule Act of April 21, 1949 (supra). In my judgment, with all due respect to the majority, the majority opinion is nothing but judicial legislation; delightful and beneficial as it ofttimes would be, we have no right to take off our Judicial robes and put on the cloak of a statesman.

I believe that the Board of Revision of Taxes and the Registration Commission should be county or city offices and that the members of the Board should not be appointed by the Judges of the Courts of Common Pleas or by any Court; but what I believe would be wisest and best is absolutely immaterial. The question is: What does the Constitution of Pennsylvania, (including the City-County Consolidation Amendment) the First Class City Home Rule Act of April 21, 1949, and the Philadelphia Home Rule Charter provide with respect to these offices?

The Board of Revision of Taxes *was created* in *1865.* When the present Constitution of *1874* was adopted it clearly denominated and specifically enumerated in Article XIV, §1, who the County officers should consist of: "County officers shall consist of sheriffs . . . and such others as may from time to time be established by law." No others have ever been established by law. The omission of the Board of Revision of Taxes from this detailed list of County officers was a clear manifestation that the Board was not considered or intended to be a County office (unless established as such by future legislation). " 'The expression of one thing in the constitution, is necessarily the exclusion of things not expressed' ": *Commonwealth ex rel. Maurer v. Witkin,* 344 Pa. 191, 196, 25 A. 2d 317.

Moreover, §2 of Article XIV of the Constitution provides that "County officers shall be elected . . .". County officers, namely, Sheriff, Recorder of Deeds, Coroner, County Commissioners and the Clerk of the

Courts, are elected by the people for a term of 4 years. The members of the Board of Revision of Taxes are appointed by the Board of Judges of the Courts of Common Pleas of Philadelphia for a term of 6 years. This is a further indication, if any additional demonstration is needed, that the members of the Board of Revision of Taxes were not understood or intended to be County officers and the office they hold is not a County office: *Porter v. Shields,* 200 Pa. 241, 49 A. 785; *Com. v. Collier,* 213 Pa. 138, 62 A. 567.

The City-County Consolidation Amendment to the Constitution and the Philadelphia Home Rule Charter were adopted in 1951. The Amendment abolished *county* offices—not state offices or city offices or any other offices except county offices. The Amendment and the Charter deal *solely* with *county* offices (or officers); neither mentions the Board of Revision of Taxes or the Registration Commission or any state agency! It is indisputable that the basic intent of the framers of City-County Consolidation and of the new City Charter was (1) to consolidate the governmental functions of the City and County of Philadelphia; (2) to abolish county offices; and (3) as soon as possible to merge them into an improved consolidated city government. The framers of the City-County Consolidation Amendment, as well as the members of the Legislature which debated and passed it, the framers of the Charter, and everyone having any connection with the proposed Amendment or Charter knew what offices had and what offices had not been denominated and specifically enumerated as County offices under the Constitution of Pennsylvania. Therefore, when the Amendment abolished County offices there was nothing to which that could possibly refer except to the offices which had been so clearly denominated as such in and by the Constitution.

Moreover, the framers of the Amendment and the Charter, and the members of the legislature knew that

the Supreme Court of Pennsylvania had repeatedly said that the Board of Revision of Taxes are *not* *"County"* officers. In *1905,* in *Com. v. Collier,* 213 Pa. 138, 141, 62 A. 567, this Court said: *"Being clearly of the opinion that the members of the board* [of revision of taxes] *are not county officers, . . ."*

In *1911,* in *Selig v. Philadelphia,* 232 Pa. 309, 81 A. 308, this Court, in adopting Judge SULZBERGER'S opinion, said: *"By no stretch of imagination can it be conceived that the city has any power over the assessors or the board of revision."* In *1937,* in *Suermann v. Hadley,* 327 Pa. 190, 193 A. 645, this Court again rejected a taxpayer's contention that the Board of Revision of Taxes were county officers and said: "Appellees contend that the members of the Board of Revision of Taxes are county officers . . . . This question was directly passed upon in Commonwealth v. Collier, 213 Pa. 138." After the adoption of the City-County Consolidation Amendment and the Charter, to wit, on January 15, 1952, *Selig v. Philadelphia* 232 Pa., supra, was again approved in *Clark v. Meade,* 369 Pa. 409, 85 A. 2d 169. In that decision this Court again recognized that the Board of Revision of Taxes is a State agency whose powers could not be interfered with by a municipality, but permitted its records to be examined by the City Controller *for the limited purpose* therein set forth, viz., to determine the amount of money which had been embezzled and thus learn the true financial condition of the City and County.

Even if these cases could be limited, refined and technically distinguished, as the majority opinion attempts to do, four irrefragable facts constitute barriers to the majority as large and impassable as the Himalayan Mountains: (a) The Constitution clearly declares who are County officers and excludes the Board of Revision of Taxes; (b) The Constitution requires Coun-

ty officers to be elected; the Board of Revision of Taxes is appointed; (c) To every layman and legislator concerned with framing, passing upon, interpreting or adopting the Amendment or the Charter, and to nearly everyone, the language of the aforesaid cases—"We are clearly of the opinion that the members of the board [of revision of taxes] *are not county officers*"—is plain, strong and unambiguous; (d) The Home Rule Act of 1949 prohibits their regulation or control by the Charter or by ordinance. We shall discuss the last two barriers more fully later on in the opinion.

In the light of the provisions of the Constitution and the prior decisions of this Court for nearly half a century, it is absolutely clear that the Board of Revision of Taxes is not and never was a County office.

The Registration Commission, whose members are appointed by the Governor of Pennsylvania for a term of 4 years, was created and in existence prior to the City-County Consolidation Amendment and the Charter and what is said in this opinion with reference to the Board of Revision of Taxes is, in principle, equally applicable to the Registration Commission.

Although it is unnecessary to pile Pelion upon Ossa, the Amendment and the Charter must be considered and interpreted in the light of the intentions of the framers thereof and of the legislature and the voters which in this class of cases are entitled to great weight: *Cohens v. Virginia,* 6 Wheaton 264, 416-420; Cf. *Peoples Bridge Co. v. Schroyer,* 355 Pa. 599, 605, 50 A. 2d 499; *American Stores Co. v. Boardman,* 336 Pa. 36, 42, 6 A. 2d 826; *Lighton v. Abington Township,* 336 Pa. 345, 354, 9 A. 2d 609. What were their intentions and how can we discover them? It is clear from the public statements, the public reports and the actions of the *framers* of the Amendment and of the Charter, and of their advocates, and of every non-political body or agency

interested in good government in Philadelphia, and of the press, and of the leaders of both political parties that they, and hence the voters, believed that the Board of Revision of Taxes and the Registration Commission were not intended to and did not fall within the City Charter, and that further legislation with respect to these offices would be necessary if they, like County offices, were to be brought under the Charter.

The language of Chief Justice MARSHALL in *Cohens v. Virginia,* 6 Wheaton 264, 416-420 (which involved the constitutionality of a statute and of a treaty and the jurisdiction of the Supreme Court of the United States) is particularly appropriate: "The framers of the constitution would naturally examine the state of things existing at the time . . . . All acknowledge that they were convened for the purpose of strengthening the confederation by enlarging the powers of the government, . . . . *Great weight has always been attached,* and very rightly attached, *to contemporaneous exposition* . . . . The opinion of the Federalist has always been considered as a great authority . . . . These essays having been published while the constitution, was before the nation for adoption or rejection, and having been written in answer to objections . . . are entitled to the more consideration . . . the Federalist says. . . [Marshall then quotes what the Federalist says].

"A contemporaneous exposition of the constitution, . . . is the judiciary act itself. We know that in the Congress which passed that act were many eminent members of the Convention which formed the constitution. Not a single individual, so far as is known, supposed that part of the act which gives the Supreme Court appellate jurisdiction over the judgments of the State Courts in the cases therein specified, to be unauthorized by the constitution. . . .

"This concurrence of statesmen, of legislators, and of judges, in the same construction of the constitution,

may justly inspire some confidence in that construction."

In the light of all these facts and all the foregoing authorities, how is it possible to say (a) that the framers of the Amendment and the Charter or the legislature or the voters intended the Charter to embrace the Board of Revision of Taxes or the Registration Commission, or (b) that such a construction could be constitutionally sustained?

Moreover, there is an additional insuperable barrier to the inclusion within the Charter of the Board of Revision of Taxes or the Registration Commission. "Municipalities are not sovereigns; they have no original or fundamental power of legislation; they have the right and power to enact only those ordinances which are authorized by [the Constitution or by] an act of the legislature: Kline v. Harrisburg, 362 Pa. 438, 68 A. 2d 182; Murray v. Phila., 364 Pa. 151, 71 A. 2d 280": *Genkinger v. New Castle*, 368 Pa. 547, 549 84 A. 2d 203. Article XV, §1 of the Constitution provides: "Cities . . . may be given the right and power to frame and adopt their own charters and to exercise the powers and authority of local self-government, *subject however, to such restrictions, limitations,* and regulations, *as may be imposed by the Legislature . . .*".

The First Class City Home Rule Act in §17, authorizes a city to frame and adopt a charter and to exercise all powers and authority of local self-government with complete powers of legislation and administration in relation to its municipal functions, *subject, however, to the limitations hereinafter prescribed* in §18: ". . . Notwithstanding the grant of powers contained in this act, no city shall exercise powers contrary to, or in limitation or enlargement of, powers granted by acts of the General Assembly which are . . . (7) Providing for the personal registration of electors; . . . (9) Providing

for the assessment of real or personal property and persons for taxation purposes." The meaning and intent of this enabling Act was to *prohibit* a First Class City from adopting a charter or enacting legislation with respect to the powers, duties, functions, or control of the Registration Commission or of the Board of Revision of Taxes. However, this situation is not irremediable. The Legislature, if it desires, can enact valid legislation to bring either or both of these offices within the Charter, or otherwise subject them to such Civil Service and political activities provisions as the Legislature may desire.

To summarize: (1) The City-County Consolidation Amendment of November 6, 1951, and the Philadelphia Home Rule Charter apply to and embrace the officers and offices of Sheriff, Recorder of Deeds, Coroner, County Commissioners and Clerk of Courts in Philadelphia, and these former County officers have now become City officers and possess all the powers, duties and functions of City officers and they and their employees are subject to and governed by the Charter; (2) Neither the Register of Wills nor the Prothonotary nor the Board of Revision of Taxes nor the Registration Commission nor any of their employees are affected or governed by the City-County Consolidation Amendment, nor do they come within the scope of the Civil Service provisions, (Article VII, §§7-100, et seq., and Chapter A-1 of the Appendix Section A-104), or the Political Activities provisions, (Article X, §§10-107) of the Philadelphia Home Rule Charter, nor under presently existing law can they be regulated or controlled by City Councils.

However, a subsidiary question has arisen in this case; i.e., whether §§8-103 and 8-104 of Article VIII of the Charter may be applicable to the Board of Revision of Taxes and the Registration Commission. These sections provide that every officer or department and board

and commission of the City and *every other agency of any kind desiring appropriations from the Council or receiving an appropriation from the City Treasury* shall, for budgetary purposes, furnish a list of officers and employees and certain information to specified City officers. These provisions are intended to and obviously will aid the City in its efforts to accurately determine its budget requirements. There is nothing in the record to show that this provision is unreasonable or that it is an invasion of or an interference with the powers, functions or discretion of the Board of Revision of Taxes or of the Registration Commission, each of which receives an appropriation from the City Treasury. We therefore would sustain, under the authority of *Clark v. Meade*, 369 Pa. supra, its validity and applicability to such agencies. Cf. also *Leahey v. Farrell*, 362 Pa. 52, 66 A. 2d 577.

---

OPINION CONCURRING IN PART AND DISSENTING IN PART BY MR. JUSTICE MUSMANNO:

I go along with the majority opinion that the offices of Register of Wills and Prothonotary of Philadelphia do not fall within the provisions of the City-County Consolidation Amendment or the Charter. I go further on the journey with Justice BELL that the office of Board of Revision of Taxes and the offices of Registration Commission are not within the application of the Amendment and Charter. For the rest of the journey I travel alone convinced beyond the peradventure of a legal doubt that until the Legislature of the Commonwealth of Pennsylvania takes further action under the authority of the City-County Consolidation Amendment, the county officers and employes (which the majority of this court have now given the appellation of "city" officers and employes) are entitled and required to

continue the performance of their county functions without interference from municipal government and without subjection to the provisions of the municipality's charter adopted prior to the passage of the amendment.

The most vital proposition in this entire discussion, it seems to me, is the unbudgeable fact that Section 7 of the City-County Consolidation Amendment categorically declares that: "Upon adoption of this amendment all county officers shall become officers of the city of Philadelphia, and, until the General Assembly shall otherwise provide, shall continue to perform their duties and be elected, appointed, compensated and organized in such manner as may be provided by the provisions of this Constitution and the laws of the Commonwealth in effect at the time this amendment becomes effective, but such officers serving when this amendment becomes effective shall be permitted to complete their terms." I repeat and emphasize: The *"county officers . . . until the General Assembly shall otherwise provide, shall continue to perform their duties and be elected, appointed, compensated and organized"* in accordance with the *"Constitution and the laws of the Commonwealth in effect at the time this amendment becomes effective."*

How could it possibly be stated any more clearly that the county officers do not change their nature simply because they are now baptized city officers?

To use a military analogy: When a division of infantry is assigned to an army corps it comes under the direction of the army corps commander but the basic duties of the infantryman always remains the same, and the division still remains under the control of the army commander, and is still an integral part of the Department of the Army. The county officers of Philadelphia have been assigned to the municipality of Philadelphia but nothing short of an act of the State itself can change the nature of their duties and responsibilities.

The *immediate* Utopia of one smoothly working governmental machine covering every possible function within the geographical confines of Philadelphia is not only a mirage of impractability, given the history of the county and city governments in Philadelphia, but there is a grave question as to whether that is what the people voted for.

Mr. Justice BELL in his excellent opinion quotes from the juridicially immortal Chief Justice MARSHALL who said: "Great weight has always been attached, and very rightly attached, to contemporaneous exposition." And with that inducement I am persuaded to reproduce several quotations in support of the position I am advancing in this Opinion. The Bureau of Municipal Research stated on January 8, 1951, in a pamphlet entitled "Citizens' Business":

"This does not mean that city-county consolidation will be complete the day after the amendment is finally approved."

"The amendment does not consolidate. It enables the Legislature to consolidate."

This same periodical said on January 22, 1951: "It has been widely believed that upon adoption of the consolidation amendment, Philadelphia could immediately extend its city charter to cover the county functions. Some have believed that if the new charter provided in advance for the county functions, the county provisions would automatically go into effect with the adoption of the amendment. Neither of these views seems correct. *The plain wording of the amendment is that no changes are to take place in the county functions until the Legislature makes them or authorizes them."*

Clarence Shenton, Esquire, expert in municipal law, formerly Director of the Bureau of Municipal Research

---

* Footnote: Italics throughout are mine.

and presently on the editorial staff of the Philadelphia Bulletin, wrote in that newspaper under date of September 18, 1951: "Applying the home rule provision of the Constitution to the county we would have no grant of home rule to the county, but only a power vested in the Legislature to grant such home rule, subject to such limitations as it might choose to impose.

*"The Legislature has not passed any law expressing any intent to give home rule powers to the county."*

The "Pennsylvania for Consolidation" was a bi-partisan organization which included many of the leading public-spirited citizens of the State, as witness the names of Governor John S. Fine, former United States Senator Francis J. Myers, Mayor David Lawrence, Hon. Joseph S. Clark, Jr., (present mayor of Philadelphia,) former Judge Nochem Winnet, Hon. Richardson Dilworth (present District Attorney of Philadelphia), Hon. James Finnegan, present President of Philadelphia City Council, Albert M. Greenfield, former State Attorney General William A. Schnader, former State Senator Harry Shapiro, Robert T. McCracken, Esq., (who actually drafted the consolidation amendment), Rev. Daniel A. Poling, Hon. John Morgan Davis (now Judge of Court of Common Pleas), and others. A pamphlet published by this distinguished organization carried this impressive declaration: "(Consolidation) is not a final step. The Amendment simply makes the present county officers city officers. Fitting them together is a later job for the state legislature or a charter amendment, or both."

The Pennsylvania Economy League, another noted civic organization, stated: ". . . if . . . adopted, all the county officers would become city officers and would continue to be elected as they are at present *until the Legislature* provides otherwise. It is clear, therefore, that before any county offices can be abolished or their

duties consolidated . . . there must be action by the Legislature either to decide the issue, or permit the voters of Phila. under their home rule powers to make the decision." (Bulletin of Oct. 15, 1951. No. 4).

A series of articles printed in the Philadelphia Bulletin for the information and guidance of the voting population *before* they voted on the consolidation amendment, carried these significant statements: ". . . The Amendment would make city officers out of all county officers and would permit the *Legislature* to decide how city officers performing county functions should be chosen."

". . . the county functions will be performed by city officers, and the *Legislature* will have the right to say which city officers will perform them and how they are to be chosen . . . There are words in the amendment which strongly indicate that the *county officers who will become city officers will continue exactly as they are,* except for the changed titles, *until the Legislature makes other arrangements."*

The present Chief Justice in the case of *Hartness v. Allegheny County,* 349 Pa. 248, 251, pointed out that counties "are political subdivisions of the State, not municipal corporations."

The word "municipal" derives from the Latin "municipalis" which in Roman law applied to a city enjoying the right of self government. A county, on the other hand, is a political subdivision or a subordinate branch of the State government.

The consolidation amendment provides that "In Philadelphia all county offices are hereby abolished, and the city shall henceforth perform all functions of county government within its area *through officers selected in such manner as may be provided by law."* Paragraph (2) clearly shows that that law is to be provided by the State Legislature for it removes the con-

stitutional restriction which forbids the legislature from enacting local and special laws and thus opens the way for special legislation in the premises. Thus supplemental legislation is obviously necessary to carry out the policy or principle sought to be effectuated by the amendment. The amendment itself did *not* consolidate, but *enabled* the legislature *to effectuate the consolidation.*

It cannot be successfully contended that the county functions have now, by virtue of the City-County Consolidation amendment, become municipal functions and therefore are encompassed in the original grant of power under the Home Rule Act. At the time the latter act was passed, the Legislature did not have the power to authorize cities of the first class to provide for "county home rule". But even if we assume, for the sake of argument, that the Legislature could grant to the City of Philadelphia home rule on the subject of county functions before it constitutionally had the power to do so, it must first clearly appear that the Legislature did so delegate such power.

The powers of a municipality are to be strictly construed: *Valley Deposit and Trust Company of Belle Vernon,* 311 Pa. 495; *Wentz v. Philadelphia,* 301 Pa. 261; *American Aniline Products, Inc. v. Lock Haven,* 288 Pa. 420.

An amalgamation of county and municipal functions in Philadelphia may eventually become a reality, but the coalescing is by no means a facile procedure, and certainly not one that can be achieved through judicial fiat. As the Courts of Common Pleas of the Commonwealth of Pennsylvania can never become municipal entities, so also county offices cannot come under the jurisdiction of a municipal executive and a municipal council without specific constitutional and statutory authority to that effect.

If the constitutional requirement has already been met, it is noon-day clear that the needed legislation to effect so drastic a change in our basic American plan of government has not yet been approved by the representatives of the people in General Assembly.

Judge GROVER LADNER in a learned and brilliant brief filed in this case has traced from the inception the constitutional and statutory provisions which apply to the facts before us. Only limitations of space would prevent me from incorporating large portions of his brief into this Opinion, but I earnestly recommend it to those considering further legislation on this subject.

The parent Act of the Charter is the First Class City Home Rule Act of April 21, 1949, P.L. 665, Section 17 of which reads, in part: (3421.17) "Subject to the limitations hereinafter prescribed, the city taking advantage of this act and framing and adopting or amending its charter thereunder shall have and may exercise all powers and authority of local self-government and shall have complete powers of legislation and administration *in relation to its municipal functions,* including the power and authority to prescribe the elective *city* officers, who shall be nominated and elected . . . in accordance with . . . the Pennsylvania Election Code. . . . The charter of any city adopted or amended in accordance with this act may provide for a form or system of *municipal government* and for the exercise of any and all powers relating *to its municipal functions,* not inconsistent with the Constitution of the United States or of this Commonwealth, to the full extent that the General Assembly may legislate in reference *thereto as to cities of the first class.* . ."

It will be observed from the above that no power is delegated to the City to legislate or provide for other than municipal functions and for municipal officers. Then, Section 18 of that Act specifically prohibits the

City from exercising power "contrary to, or in limitation or enlargement of, powers granted by acts of the General Assembly, which are . . . (b) *Applicable in every part of the Commonwealth.* (c) *Applicable to all the cities of the Commonwealth."*

As counties are subdivisions of the Commonwealth, the prohibitions here against the City exercising control over county offices is obvious.

Of course, through the process of constitutional amendment the City may be assigned any governmental function the people see fit, even over county offices. But it cannot be successfully argued that the constitutional amendment approved November 6, 1951, gave this power to the Charter. The Charter was adopted *before* the passage of the amendment. The constitutional amendment cannot, under any circumstances, work *retroactively!*

Although the constitutional amendment abolishes county offices it does not abolish the functions of county officers. It figuratively moves the county officers into a building owned by the municipal government, but it does not make the officers subject to the orders of the municipal landlord because, as already indicated, Section 7 of the Consolidation Amendment states as plainly as anything can be stated that "until the General Assembly shall otherwise provide, [the county officers] shall continue to perform their duties, etc."

The majority opinion assumes that the amalgamation it states has already taken place, will effect sweeping changes which will bring about a Swiss watch tidiness and orderliness in governmental Philadelphia. It is my considered judgment that until the Legislature, or perhaps even the City Council, passes further imperatively needed legislation to implement the consolidation amendment, confusion will run rampant in all the former county offices, a confusion that could ad-

versely affect city offices as well. The majority opinion, for instance, speaks of the wisdom of having one law department for all the city departments, but, as already indicated, the duties of the former county offices have not yet been absorbed into the city government. I do not see the wisdom of having one "unified interpretation" of legal problems arising in different offices, under different circumstances and from different facts. Legal brains are not to be pooled in one reservoir of stultifying uniformity. Each county office has its own problems and they can better be solved by the solicitor permanently located there, (because of his experience, special study and continuing application,) than by one who from an ivory tower of remote control will dispense standardized advice to all departments, all offices, and on all situations.

Furthermore, how is this super legal bureau to be established, how will the personnel be selected, how will the work be divided, will there be special training to prepare assistants for the varying problems which will come up in the Coroner's office, the Commissioners' office, the Registration Commission office, and so on? If the majority opinion becomes effective without intervening legislation to work out the details of this drastic, elephantine, governmental metamorphosis, I do not see how Chaos can be prevented from knocking at the door of every former county office in Philadelphia.

The purpose of the constitutional amendment was to free the legislature from the shackles that the Constitution imposed and thus make possible the accomplishment of this much desired and needed governmental reform. But until the legislature acts,—following reports and studies on the present situation and what yet has to be done before the ideal blending of county and city can become a reality,—the county functions cannot constitutionally (and should not) be interfered

with. The harassment of county officers in this embryonic phase of consolidation can only cause chaos, distrust, and quarreling—all so entirely unnecessary.

Changes of this magnitude require time. Rome was not made in a day. A precipitate attempt to throw county and city together without the necessary preparation can undo the wonderful work accomplished so far by the public spirited and patriotic citizens who initiated the plan to lift Philadelphia to the high position she deserves in the sisterhood of the great cities of the world.

The foundation for Great Philadelphia has been laid. The pillars must be carefully placed so that no Samsonian force in the years to come can pull them down, creating greater confusion than the original one the consolidation plan was intended to correct.