City Council Members : George X. Schwartz et al., Appellants *v.* Consumers Education and Protective Association et al., Appellees.

446

Argued November 18, 1980, before President Judge CRUMLISH and Judges WILKINSON, JR., ROGERS, BLATT, CRAIG, WILLIAMS, JR. and PALLADINO. Judges MENCER and MACPHAIL did not participate.

*Alan J. Davis,* City Solicitor, with him, *Judith N. Dean,* Deputy City Solicitor, for appellants.

*David Kairys, Kairys Rudovsky & Maguigan,* with him, *Peter Goldberger,* National Lawyers Guild, for appellees.

OPINION BY PRESIDENT JUDGE CRUMLISH, April 13, 1981:

This unique controversy presents a complex request to this Court for a resolution of the interrelationship between the Home Rule Amendment of November 7, 1922, Article IX, Section 2 of the Pennsylvania Constitution, the First Class City Home Rule Act of April 21, 1949, P.L. 665, the City-County Consolidation Amendment, Article XIV, Section 8, and the Philadelphia Home Rule Charter. Simply stated, we must determine whether City Council has the constitutional or statutory authority to affix the rate of compensation for its members and the other principal elected officers of the city, and, if so, whether any conditions subsequent need be met before that authority may be exercised. In addition, we are called upon to determine whether there exist any constitutional, statutory or common law limitations upon City Council's authority to ordain these salary increases after election to office but before the beginning of the term to which the new or re-elected members have been elected.

On December 20, 1979, Bill No. 2357 was passed by the City Council of Philadelphia voting twelve to zero[1] and was signed four days later by the then-Mayor Frank L. Rizzo, well after the November 6, 1979 General Election.[2] The new ordinance outlined the following scheme of annual salary increases for the City's elected offices:

| | | |
|---|---|---|
| President, City Council | $10,000 | [55,000] |
| Majority Leader, City Council | $11,000 | [38,000] |
| Majority Whip, City Council | $11,000 | [37,000] |
| Minority Leader, City Council | $11,000 | [37,000] |
| Council Members | $10,000 | [35,000] |
| Mayor | $10,000 | [65,000] |
| City Controller | $ 8,000 | [50,000] |
| Clerk of Quarter Sessions | $ 9,000 | [35,000] |
| Sheriff | $ 9,000 | [35,000] |
| Chairman, City Commissioners | $ 9,000 | [37,000] |
| City Commissioners | $ 9,000 | [35,000] |
| Register of Wills | $ 9,000 | [35,000] |
| District Attorney | $ 8,000 | [50,000] |

On January 8, 1980, Appellees[3] filed a suit in equity to enjoin the implementation of the pay scale for all

---

[1] City Council membership then consisted of thirteen members, twelve voting in favor of the bill—Joseph E. Coleman, Melvin Greenberg, Harry P. Jannotti, Louis C. Johanson, Jack Kelly, Charles E. Murray, Al Pearlman, Francis Rafferty, George X. Schwartz, James J. Tayoun, Earl Vann, and Anna Cibotti Verna—while Councilwoman Beatrice K. Chernock was absent for the vote.

[2] On November 6, 1979, Council members Greenberg, Kelly, Murray and Vann were not re-elected, while Council members John C. Anderson, Lucian E. Blackwell, Augusta A. Clark, David Cohen, Joan Krajewski, Brian J. O'Neill, Joan Specter, and John F. Street assumed office for the first time on January 7, 1980. Hence, only eight of the twelve voting and seventeen overall council members had a hand in passing the bill.

[3] Appellees here and Plaintiffs below consist of unincorporated organizations and associations including the Consumers Education and Protective Association, Consumer Party, Tenant Action Group, Puerto Rican Alliance, Resident's Coalition, Raymond Rosen Direct

twenty-six elected offices.[4]  On April 7, 1980, Philadelphia County Common Pleas Court Judge William M. Marutani entered a decree nisi enjoining the payment, acceptance or receipt of any increase in salary or benefits arising from the ordinance. Subsequently, cross-exceptions were filed and argument was heard by a panel of Judges MARUTANI, JACOB KALISH and CHARLES A. LORD, each of whom filed separate opinions. When the decree nisi was made absolute, the City appealed.

## I. GENESIS

### HOME RULE IN PHILADELPHIA—HISTORY—LAW

One of the bitter effects of the War Between The States was the widespread political corruption found in the shattered and disillusioned state establishments of the Reconstruction Era.

As historical review so cogently reminds us, violence leads to suppression and opens the path for parasitic opportunists.  Political bodies enjoyed no exemption, and so it was in this setting in the Southern

Action Association, and North Central Revitalization Coalition and named citizens and residents of Philadelphia, Lee Frisell, Max Weiner, John Brickhouse, Maisha Jackson, Eva Gladstein, Juan Ramos, Ralph Wynder, Fr. Joseph Kakalee, Shaheed Abdul-Haqq, and Ralph Goldstein.

  [4] Named defendants include incumbent council members Coleman, Jannotti, Johanson, Pearlman, Rafferty, Schwartz, Tayoun, and Verna; newly elected council members Anderson, Blackwell, Clark, Cohen, Krajewski, O'Neill, Specter, and Street; elected city officers, Mayor William J. Green, City Controller Thomas A. Leonard, Clerk of Quarter Sessions Edgar C. Campbell, Sr., City Commissioners Eugene E. J. Maier, Margaret Tartaglione, and John F. Kane, Sheriff Joseph A. Sullivan, and Register of Wills Ronald R. Donatucci; District Attorney Edward G. Rendell, although that office was not scheduled for the November 6th ballot; and Acting City Treasurer Gay P. Gervin and Director of Finance G. Edward DeSeve in their respective fiscal capacities with the city.

States' struggle for survival that the movement toward placing increasing power and responsibility into the hands of those most able and willing to rejuvenate their self-respect was born. The people in the towns, boroughs and hamlets were given the proclamation and mandate to restore and preserve their heritage.

In the Northern States and, in particular, Pennsylvania, the time for accepting self-governing, home-ruled municipal bodies had not yet come. It was not until the visionaries of the 20th Century foresaw the need for this kind of municipal self-government that the concept of home rule was placed before the people of the Commonwealth for their guidance and approval.[5]

On November 7, 1922, the Pennsylvania Constitution was amended to permit the General Assembly to implement home rule at its own discretion. Article XV, Section 1, now Article IX, Section 2, empowered cities "to frame and adopt their own charters and to exercise the powers and authority of local self-government, subject, however, to such restrictions, limitations, and regulations as may be imposed by the legislature."[6] However, the General Assembly after twenty-seven years of procrastination finally surrendered its control over municipal affairs to local government, but then only to cities of the first class.[7] Cautious as it was in permitting home rule then limited to Philadelphia, the legislature's delegation of powers and duties was uncharacteristically generous.

---

[5] *See generally Note, Home Rule in Pennsylvania*, 81 Dickinson L. Rev. 265 (1977).

[6] The story of the amendment and its subsequent home rule bill in 1949 is filled with many chapters of political opposition and organized public opinion. *See* Joseph D. Crumlish, *A City Finds Itself: The Philadelphia Home Rule Movement* (1959).

[7] Renumbered by the Pennsylvania Constitution of 1968, Article IX, Section 2 mandated home rule enabling legislation for "municipalities" as well.

The First Class Home Rule Act, Act of April 21, 1949, P.L. 665, *as amended,* 53 P.S. §§13101 et seq., was enacted to effectuate the constitutional home rule amendment's authorization of local self-government. Section 17, 53 P.S. §13131, specifically provides that a city which frames and adopts its own charter according to the legislative grant

> shall have and may exercise all powers and authority of local self-government[,] . . . shall have complete powers of legislation and administration in relation to its municipal functions [,] . . . may provide for a form or system of municipal government and for the exercise of any. and all powers relating to its municipal functions, not inconsistent with the Constitution of the United States or of this Commonwealth, to the full extent that the General Assembly may legislate in reference thereto as to cities of the first Class, and with like effect [,] . . . the city may enact ordinances, rules and regulations necessary and proper for carrying into execution the foregoing powers and all other powers vested in the city by the charter it adopts or by this or any other law.

On April 17, 1951, imbued with a spirit of reform and innovation, the electors of the City, tired and resentful of its "corrupt and contented" reputation, seized upon the legislature's grant of authority and adopted a Home Rule Charter, to take effect January 7, 1952, at the commencement of the January 1952-1956 term. The expressed purpose of the Charter as prepared by the Philadelphia Charter Commission[8]

---

[8] Imbued with Bipartisan political support, the dynamic Richardson Dilworth inspired civic leaders from all walks of professional life to contribute to the Charter Commission for the sole purpose of forging this extraordinary document. Seldom, if at all, in the distinguished history of this Commonwealth, and locally not since the

under Article XV, Section 1 of the Constitution and the First Class City Home Rule Act was to assure the City the broadest, most comprehensive benefits of municipal self-government. Ordaining compensation for elective city offices, the Charter provided for Council membership in Section 2-100:

> The Council shall consist of seventeen members, of whom ten shall be elected from districts and seven from the City at large. The terms of councilman shall be four years from the first Monday in January following the year in which they were elected except that a councilman elected to fill a vacancy shall serve only for the balance of the unexpired term. Each councilman shall receive a salary at the rate of $9,000 per annum, or such other sum as the Council shall from time to time ordain, and the President of the Council shall receive in addition a salary at the rate of $1,000 per annum, or such other sum *as the Council shall from time to time ordain.* (Emphasis added.) 351 Pa. Code §2.2-100.

The Charter, in Section 3-600, further provided that the Mayor and other officers would be compensated as follows:

> *Until the Council shall otherwise ordain,* annual salaries shall be payable in equal semi-monthly installments as follows:
>
> Mayor, $25,000;
>
> . . . .
>
> City Controller, $15,000;
> . . . . (Emphasis added.)

351 Pa. Code §3.3-600.

---

early sessions of the Continental Congress meeting in Colonial Philadelphia have such talented, resourceful, inspired leaders met to breathe new life into a decadent city.

However, the Charter did recognize the impending City-County Consolidation Amendment in Section 1-102(2), 351 Pa. Code §1.1-102(2), by providing that any additional executive or administrative power conferred on the City by amendment of the Constitution or laws of the Commonwealth shall be designated and distributed among new or existing officers, departments, boards or commissions of the City.[9]

Prior to November 6, 1951, Article XIV, Section 1 of the Constitution specifically provided that county officers include the Sheriff, Register of Wills, Commissioners, Clerks of Court, and District Attorney. In *Lennox v. Clark*, 372 Pa. 355, 361, 93 A.2d 834, 837 (1953), our Supreme Court summarized the conditions as they existed in Philadelphia:

Nothwithstanding the consolidation of the city effected by the Act of February 2, 1854, P.L. 21, the structure of the government of Philadelphia continually grew more and more complex and ultimately completely outmoded. Instead of a unified system there existed dual governments. Entirely different rules and regulations prevailed in the city and the county offices; in the one the employes were under civil service, in the other way they were appointed without any examination as to their

[9] *See* Section 1-102(2) n. 2 of the Philadelphia Home Rule Charter, 351 Pa. Code §1.1-102(2) n. 2, which expresses the purpose of this section: "Subsection (2) looks forward to City-County consolidation. Any additional executive and administrative powers acquired by such a constitutional amendment are to be exercised by officers and agencies designated in the Charter, as the Council may determine. If such a division of new powers proves to be impracticable, new offices, boards and commissions, but not new departments, may be created to take over such powers but such new agencies would be subject to all the other provisions of the Charter, including, for example, civil service requirements. Wherever possible each new board and commission is to be attached to a City department."

qualifications; in the one they were barred from political activities, in the other they were wholly unrestricted in that respect; in the one the officers were compelled to seek their legal advice from the City Solicitor, in the other they were allowed to have their own counsel. These anomalies flourished in spite of the fact that all the offices and departments, city and county, participated in the government of the same compact area and its inhabitants. Moreover, the personnel of the county offices were paid, after the Consolidation Act of 1854, not out of any county treasury, for none such existed, but by the city, and their salaries and wages were, except in the case of elected officers, fixed and determined by the city council. (Act of May 2, 1945, P.L. 375, as amended by the Act of May 2, 1947, P.L. 134). It is no wonder, therefore, that over a great number of years there has been considerable popular agitation for the correction of this patch-work system and its uneconomic division of functions, and it was presumably in response to that agitation that the City-County Consolidation Amendment, the First Class City Home Rule Act and the Home Rule Charter came into being ....

On November 6, 1951, the people of Pennsylvania adopted Article XIV, Section 8, now Article IX, Section 13, known as the "City-County Consolidation Amendment." The Amendment immediately abolished all Philadelphia county offices, made them city offices, authorized city government to perform the functions of the county government, and instructed that *"until the General Assembly shall otherwise provide,* [these offices] shall continue to perform their duties and be elected, appointed, *compensated* and organized in such a manner as may be provided by

the provisions of this Constitution and the laws of the Commonwealth in effect at the time this amendment becomes effective . . . .'' (Explanation and emphasis added.) Article IX, Section 13(a).

Subsequently, the Home Rule Act was supplemented by the legislature, Act of August 26, 1953, P.L. 1476, *as amended,* 53 P.S. §13151, to carry out the commingled intent and purpose of the Constitution's Article XV, Section 1 Home Rule Amendment and Article XIV, Section 8 of the City-County Consolidation Amendment by enabling the Philadelphia City Council,

> pursuant to Section 1-102(2) of the Philadelphia Home Rule Charter, to integrate and merge within the framework of the government of the City of Philadelphia functions heretofore performed by certain officers, offices, boards or commissions, so that hereafter all of these functions may be carried out by officers, offices, departments, boards or commissions of the City of Philadelphia under the provisions of the Home Rule Charter . . . pursuant to the First Class City Home Rule Act. . . .

Although the language and meaning of the City-County Consolidation Amendment is unambiguous, its relationship with the Act of 1953 requires lucid explanation. For this, we refer to the instructions of *Commonwealth ex rel. Truscott v. Philadelphia,* 380 Pa. 367, 111 A.2d 136 (1955), where our Supreme Court declared unconstitutional and void an attempt by Philadelphia City Council to eliminate the Board of Revision of Taxes:

> The clear and unmistakable meaning of clauses (1) and (7) of the Amendment when considered together is that all county offices as such are abolished by the Amendment and thenceforth the City shall perform all functions

which were formerly considered functions of county government; and county offices and county officers shall be considered and operated as city offices and City officers, except that such officers shall continue to perform their duties and be elected or appointed, compensated and organized in accordance with the Constitution and the existing laws of the Commonwealth—not until the people of Philadelphia or the City Council shall otherwise provide, *but*—'*until the General Assembly shall otherwise provide.*' (Emphasis added.)

*Id.* at 372, 111 A.2d at 137-38.

*And see Lennox v. Clark, supra,* and *Carrow v. Philadelphia,* 371 Pa. 255, 89 A.2d 496 (1952). Clearly, City Council had only those powers of organization, abolition and legislation with respect to the former county offices as the General Assembly might provide by an Act of Assembly after November 6, 1951.

## II. CITY COUNCIL AUTHORITY

Having outlined these constitutional and legislative authoritative directions, initially we conclude that Council members, the Mayor, and City Controller, as specifically enumerated officers, have been and remain city officials, then and now dependent upon the legislative branch of *city* government for compensation. Therefore, it is incumbent upon us to identify, if possible, whether the General Assembly has authorized municipal action for any or all of the former county officials.

### A. Clerk of the Court of Quarter Sessions, Oyer and Terminer and General Jail Delivery

In accordance with Section 2 of the Legislature's Act of August 26, 1953, P.L. 1476, *as amended,* 53 P.S. §13132, we acknowledge support for the proposed raise.

City Council was not only given full powers, subject to the Charter and First Class City Home Rule Act of 1949, "to legislate with respect to the election, appointment, *compensation*, organization, abolition, merger, consolidation, powers, functions and duties of the . . . Clerk of the Court of Quarter Sessions, Oyer and Terminer and General Jail Delivery . . . ." 53 P.S. §13132(a),[10] but could alter or abolish the manner of his selection "without submitting the determination of that question to the electorate of the City of Philadelphia." 53 P.S. §13132(b). In *Commonwealth ex rel. Truscott v. Philadelphia, supra,* and later in *Commonwealth ex rel. Truscott v. DiLauro,* 387 Pa. 506, 514, 128 A.2d 348, 351 (1957), our Supreme Court approved City Council's authority to act under this Act of 1953. Faced with a Philadelphia ordinance making the City Treasurer an appointed rather than elected official, the Court concluded that the legislature's 1953 authorization to Council met the City-County Consolidation Amendment proviso and clearly validated Council's action. Therefore, we conclude that City Council has properly maintained and shouldered the responsibility for compensation of the Clerk of Court of Quarter Sessions, Oyer and Terminer and General Jail Delivery in Philadelphia.[11]

B. *Sheriff and City Commissioners*

After an intensive, exhaustive review of the Legislature's Act of August 13, 1963, P.L. 795, *as amended,*

---

[10] Also incorporating the Coroner, Recorder of Deeds, City Treasurer, and the Board of Inspectors of the Philadelphia County Prison, the Act validates Section 1-102(2) of the Charter, 351 Pa. Code §1.1-102(2), and confirms the power of action for City Council.

[11] We note that this Clerk of the Court of Quarter Sessions was added to Council's list in 1960 when salary was set at $16,500. Philadelphia Ordinance Book 1960, p. 910. Increases in 1967 to $19,750, 1970 to $20,000, and 1973 to $23,000 brings us to date. *See* Philadelphia Ordinance Book 1960, p. 910; 1967, p. 4; and 1973, p. 1081.

53 P.S. §13132, we must conclude that City Council has failed to act upon legislative authorization by submitting this ordinance or any ordinance to the electorate of the City for approval, and that the compensation provided in the Ordinance to those offices is unwarranted in law.

Initially, we note that Section 5 of the Act of 1953, 53 P.S. §13154, had no effect upon the selection, organization or compensation of either the Sheriff or the City Commissioners, and simply maintained the power and authority in existence immediately preceding the City County Consolidation Amendment.[12] Our conclusion is supported by the Supreme Court's evaluation of the 1957 City Treasurer's plight in *Commonwealth ex rel. Truscott v. DiLauro, supra,* by noting that the Act of 1953 withheld the grant of regulatory power in the case of the Sheriff and the City Commissioners. 387 Pa. at 514, 128 A.2d at 351.

On August 13, 1963, the legislature acted. City Council was given full power, subject to the Charter and Home Rule Act, "to legislate with respect to the election, appointment, *compensation,* organization, abolition, merger, consolidation, powers, functions and duties of the *Sheriff, City Commissioners,* Registration Commission and Board of Revision of Taxes. . . ." (Emphasis added.)[13] 53 P.S. §13132(c). However, subsection (d) provides that legislation adopted by Council under the authority of subsection (c) is ineffective "until approved by the electorate of the City of Philadelphia in the same manner as amendments to the Home Rule Charter under the First Class City Home Rule Act." 53 P.S. §13132(d). In short, the Act of 1963 vested City Council with administrative con-

[12] This provision was subsequently repealed by Section 2 of the Act of 1963 and replaced by Section 1, 53 P.S. §13132(c), (d).

[13] The Legislature's Act of 1963 also validated the Charter and confirmed the Council's power. 53 P.S. §13132(c). *See* n. 10, *supra.*

trol over the offices of Sheriff and City Commissioners but is clearly and explicitly subject to ratification by the Philadelphia electorate.[14]

Prior to 1963, our legislature specifically provided compensation guidelines for both offices. Compensation for the Sheriff was initially set in 1883 and remained unchanged until 1947,[15] while compensation was set in 1955 and again in 1961 for the City Commissioners of Philadelphia.[16] On the other hand, Council records since 1963 show compensation increases for the Sheriff in 1967, 1970, and 1973,[17] and the City Commissioners in 1967, 1968, and 1973.[18] However, a re-

---

[14] For an example of this voter ratification process, *see Sweeney v. Tate*, 420 Pa. 45, 46, 216 A.2d 77, 78 (1966), wherein our Supreme Court approved a City Council ordinance which abolished the Registration Commission and transfered its function to the City Commissioners. The Court concluded that Council complied with all constitutional and statutory requirements, and acted within its legislative powers in adopting the ordinance and submitting it to the electorate for final approval.

[15] Legislative records reveal that compensation for the Sheriff of Philadelphia was set in 1883 at $15,000, Act of June 13, 1883, P.L. 113, and remained unchanged until 1947 when it was increased by ten percent to $16,500, Act of June 21, 1947, P.L. 849. Although the Act of 1947 fails to identify any office by title, Article XIV, Section 1 of the 1874 Constitution specifically designates the Sheriff as a county officer. *Compare* the repealing language of the Act of August 8, 1961, P.L. 969, regarding the office of the Philadelphia Register of Wills.

[16] The annual salary of the City Commissioners of Philadelphia was set in 1955 at $15,000, Act of August 9, 1955, P.L. 312, and in 1961 at $18,000, Act of May 23, 1961, P.L. 220, *as amended*, 16 P.S. §7301.

[17] Although added by Council in 1960 at a rate of $16,500, the Sheriff received increases in 1967 to $18,000, 1970 to $20,000, and 1973 to $26,000. *See* Philadelphia Ordinance Book 1960, p. 910; 1967, p. 4; and 1973, p. 1081.

[18] Added in 1967, the Chairman of the City Commissioners was set at $19,750, increased in 1968 to $22,000, and in 1973 to $28,000, while the Commissioners received $18,000 in 1967, $20,000 in 1968,

view of the election returns since 1963 discloses no referendum of any kind purporting to relate to either the Sheriff or the City Commissioners. We conclude, therefore, that without the approval of the electorate of the City of Philadelphia, the requirements set down by our legislature have not been satisfied, and City Council was without authority to order compensation under the provisions of the 1979 ordinance. We must also hold that compensation paid by councilmanic ordinance without referendum in the prior years is unwarranted in law.[19] Consequently, we have no choice but to conclude that the Legislature's Acts of June 21, 1947 and May 23, 1961 finalized compensation for the Sheriff and City Commissioners, respectively.

### C. *Register of Wills*

Although the Constitution instructs us that the Register of Wills is a "city officer," the office is not yet subject to the mandates of the Charter or the dictates of City Council without approval from the electorate of Philadelphia.

Initially, we point out that the City-County Consolidation Amendment did not convert the Register of Wills to a "city officer" subject to the provisions of the City Charter. *Lennox v. Clark, supra.* In *Lennox,* our Supreme Court carefully concluded that the Register's probate of wills constituted a judicial act encircling the office with a cloak of constitutional protection.

In *Walsh v. Tate,* 444 Pa. 229, 282 A.2d 284 (1971), the Supreme Court modified its *Lennox* ruling in light

----

and $26,000 in 1973. *See* Philadelphia Ordinance Book 1967, p. 5; 1968, pp. 12-13; and 1973, p. 1081.

[19] By our decision, we do not address the rights, responsibilities or liabilities, if any, for the payment and receipt of the compensation by these city officials, or who, if anyone, may seek by litigation to remedy these councilmanic aberrations.

of the 1968 Constitution's transformation of the Register of Wills from a constitutional officer to a city official. The specific language of Section 16(y) of the Schedule to the Judiciary Article of the 1968 Constitution as relied upon in *Walsh* declares: "The Offices of prothonotary and register of wills in the City of Philadelphia shall no longer be considered constitutional offices under this Article, but their powers and functions shall continue as at present until these offices are covered in the Home Rule Charter by a referendum in the manner provided by law." Consequently, the Court concluded that, absent the mandated referendum, the Register of Wills not only remains an essentially judicial office as it existed on the effective date of the 1968 Constitution, but serves ex officio as Clerk of the Orphans' Court Division of Common Pleas (16(n) of the Schedule to the Judiciary Article) subject to the supervisory and administrative control of the Supreme Court, and the legislative parameters set by the General Assembly. *Id.* at 239-40, 282 A.2d at 289.

Since there has yet to be a referendum approved by or placed before the Philadelphia electorate on the issue of the Register's status vis-a-vis the Charter, we must follow the instructions of the Constitution and our Supreme Court and conclude that the control over compensation for the Register's office remains within the exclusive province of the legislature.[20]

However, a historical review of compensation for the Register of Wills reveals a level of legislative duality guaranteed to produce judicial nightmares. In 1961 and again in 1968, the legislature specifically set

---

[20] We note that the legislature continues to set the salary levels for Register of Wills in counties of the second through the eighth classes. Section 7 of the Act of November 1, 1971, P.L. 495, *as amended*, 16 P.S. §11011-7.

the salary for the Philadelphia Register of Wills,[21] but repealed that provision in 1974[22] without providing either a subsequent provision or new salary level. On the other hand, the City added the Register of Wills to its ranks in 1960, and provided periodic increases in 1968 and 1973.[23] In fact, in 1968, the legislature authorized a $12,000 salary for the Register while the city set compensation at $22,000. Amidst this confusion, we are obliged to follow the directions of the 1968 Constitution, and conclude that until the issue of salary is decided by referendum, City Council is without authority to act on the Register's compensation. In short, the repealer put the issue of the Register's salary in neutral, and in our opinion must remain there until either the Legislature responds or the City voters approve the compensation by referendum.[24]

### D. District Attorney

Our penetrating review has failed to disclose any post-City-County Consolidation Amendment authority by which the legislature's function of setting the District Attorney's salary was transferred to City Council. Without a specific statutory transfer of authority, we conclude that only the Legislature may provide the rate of compensation for the District Attorney of Philadelphia.[25]

---

[21] From 1961 to 1968, the salary rose from $9,000 to $12,000, Act of August 8, 1961, P.L. 969, as amended, 20 P.S. §2047.

[22] Repealed by Section 19 of the Act of December 10, 1974, P.L. 867, amending Title 20 of the Pennsylvania Consolidated Statutes.

[23] The Register of Wills' salary rose from $16,500 in 1960 to $22,000 in 1968 to $26,000 in 1973, Philadelphia Ordinance Book 1960, p. 910; 1968, p. 478; and 1973, p. 1081.

[24] See n. 19, supra.

[25] For counties of the second class, 16 P.S. §440(d), counties of the third and fourth classes, 16 P.S. §1401(g); and counties of the fifth through eighth classes, 16 P.S. §11011-5.

Although our Supreme Court has determined that the District Attorney of Philadelphia is a city officer subject to the provisions of the Home Rule Charter, it has specifically noted that "his term of office and his salary are fixed by the Legislature. . . ." *See* Chief Justice BELL's concurring opinion in *Chalfin v. Specter*, 426 Pa. 464, 471, 233 A.2d 562, 565 (1967).

In practice, the rate of compensation for the Philadelphia District Attorney was specifically set by the legislature in 1955 and again in 1961.[26] However, for some reason not readily available to research, City Council added the office to its compensation rolls in 1968, and made subsequent incremental raises in 1970 and 1973.[27] But clearly, the General Assembly continued to control the District Attorney's salary well *after* the enactment of the Charter and after the passage of the City-County Consolidation Amendment. It is therefore indisputably the intention of the legislature to continue providing the Philadelphia District Attorney's compensation.

Having found no legislative grant of authority to City Council, we must nullify the District Attorney's salary provision in the 1979 Ordinance and conclude that the three prior Council-originated pay raises were without legal warrant.[28]

### III. LIMITATIONS ON CITY COUNCIL'S AUTHORITY
### THE LOWER COURT DECISION

From this harrowing expedition into the constitutional and statutory frontiers of city-county consoli-

---

[26] In 1955, the District Attorney's salary was set at $18,500, Act of August 9, 1955, P.L. 312, and increased in 1961 to $22,500, Act of June 14, 1961, P.L. 371, *as amended*, 16 P.S. §7706.

[27] In 1968, Council set the District Attorney's salary at $31,500, raising it to $34,000 in 1970 and $42,000 in 1973. *See* Philadelphia Ordinance Book 1968, p. 14; 1970, p. 299; and 1973, p. 1081.

[28] *See* n. 19, *supra*.

dation and home rule, we have determined that City Council possesses the authority to regulate compensation for Council Members, the Mayor, the City Controller, and the Clerk of the Court of Quarter Sessions, Oyer and Terminer and General Jail Delivery. The question then becomes whether there exist constitutional, statutory or common law prohibitions which would operate to either block the proposed increases completely or restrict the compensation changes to *before* election rather than the subject post-election increases.

### A. *Constitutional Prohibition: Article III— Section 27*

Article III, Section 27 (formerly Section 13) provides that "[n]o law shall extend the term of any public officer, or increase or diminish his salary or emoluments, after his election. . . ." Judge MARUTANI concluded that a municipal pay raise ordinance does not constitute a "law" within the meaning of Article III, Section 27 and therefore is not constitutionally prohibited. Judge LORD added that *Baldwin v. City of Philadelphia*, 99 Pa. 164 (1881), has never been overruled and that to hold otherwise would place a constitutional limitation on salaries in Philadelphia, inapposite to home rule and anomalous to other municipalities not governed by the same constitutional limitation. We agree.

In *Baldwin*, the Supreme Court ruled that Article III, Section 13, now Section 27, was inapplicable to a Philadelphia ordinance which increased the salary of an elected municipal officer even though the increase was enacted and effective during his term of office:

> The ordinance of councils by which the plaintiff's salary was increased is not a law, and therefore does not come within the constitutional prohibition. It is a mere local regulation

for the City of Philadelphia. It has perhaps the force of law in the community to be affected by it, but it is not prescribed by the supreme power, it concerns only a subdivision of the state, and does not rise to the dignity of a law. There is no ambiguity in this section of the constitution [Section 13 of Article III of the Constitution of 1874]. It is clear and explicit. But when we consider it in connection with the other portions of the 3rd article, there is no room for doubt. It is the article upon 'Legislation,' and is very elaborate. It contains thirty-three sections, and is throughout a restraint upon the powers of the general assembly. It imposes numerous restrictions upon the mode by which laws shall be passed, and prohibits legislation upon a large variety of subjects. When, therefore, section 13 declares that 'no law shall extend the term of any public officer, or increase or diminish his salary or emoluments, after his election or appointment', the obvious meaning is that the General Assembly shall not pass such a law. There is nothing in the article, even by implication, that would justify us in extending the word 'law' to the ordinance of a city. Such an interpretation would not be expounding the constitution; it would be altering it. (Explanation added.)

*Id.* at 170-71.

Although Judges MARUTANI and LORD expressed concern for *Baldwin's* continued viability, they felt bound by the decision. Judge MARUTANI pointed out its more recent citation in *McKinley v. Luzerne Township School District*, 383 Pa. 289, 292-93, 118 A.2d 137, 139 (1955), where the Supreme Court held the Constitutional prohibition inapplicable to a school board's attempt to increase its tax collector's yearly compensation.

Pressing their only attack, appellees demean *Baldwin* for its strict, formalistic application of Article III, Section 27's use of the term "law" to Acts of the General Assembly, and urge the adoption of Judge KALISH's concurring opinion that home rule has given the Philadelphia ordinance the force and status of a legislative enactment. This position does not reflect a true understanding of either the intent of the constitutional provision or the legislature's concept of home rule and municipal self-government for Philadelphia. For a clearer view, we again look to the history of Pennsylvania Government.

In 1881, the relationship between state and local government in Pennsylvania was much the same as it had been in colonial days. Counties, townships, boroughs, towns and cities existed to serve the sovereign power of the state. In fact, our Supreme court in *Philadelphia v. Fox*, 64 Pa. 169 (1870), expounded upon this prevailing doctrine of state sovereignty over municipal government.

To our reading, Article III, Section 13 of the 1874 Constitution did little more than solidify this entrenched sovereignty by prohibiting any "law," defined by *Baldwin* as an act of the legislature, from increasing the salary of any public officer after election or appointment. *Baldwin* clearly tells us that a Philadelphia municipal ordinance is *not* a "law" within the purview of Article III, Section 13. Rather, the term must be read with Article III in its entirety and it becomes clear that in each section of the Legislation Article of the Constitution, the term "law" connotes legislative action by the General Assembly.

Essentially, we must conclude that the 1922 Home Rule Amendment and the 1949 First Class City Home Rule Act alters neither the intent nor the application and interpretation of the Constitution.

To our review, the only change brought about by the 1922 Amendment was the General Assembly's recognition that the impending availability of home rule when coupled with *Baldwin* would eliminate Article III, Section 13's application and effectiveness. Hence, the Legislature's Act of May 13, 1927, P.L. 992, *as amended,* 53 P.S. §13403, extended the prohibition against post-election salary increases to include "city, borough, town or township" rather than "law" under the Constitution. Why else would the legislature feel the need to complement an existing prohibition except if Article III, Section 13 did not apply to laws at the local level of government?

Although few decisions have touched upon this issue since the advent of home rule, *Baldwin* continues to stand upon solid foundation. In *Hadley's Case,* 336 Pa. 100, 6 A.2d 874 (1939), the treasurer of the City and County of Philadelphia questioned whether the Legislature's Act of April 8, 1937, which designated him as a Commonwealth tax collector and established commission rates, violated Article III, Section 13. Although attention was focused on the interpretation of "public officer" rather than "law," the decision expressly addresses an Act of the Legislature and not a municipal ordinance:

> The purpose of the framers of the Constitution in placing limitations upon *legislative interference* with the compensation received by a public officer for the duties normally incident to the office was to eliminate political or partisan pressure upon the incumbents of office after they had been elected or appointed. (Emphasis added.)

*Hadley, supra* at 105, 6 A.2d at 877.
Since the challenge involved an Act of Assembly, the City charged a violation of Article III, Section 13, not the Act of 1927.

In *McKinley v. Luzerne Township School District, supra,* a court ruling reducing the compensation of a school tax collector after his election was challenged as violative of Article III, Section 13. Although concluding that judicial action is not a "law" under the provision, the decision embraces the *Baldwin* concept:

> Nor is the court's decree violative of Article III, Section 13 of the Constitution of Pennsylvania . . . since that provision applies only to a *law,* which means an act of the legislature, and not to action by any municipal or local authority: Baldwin v. City of Philadelphia, 99 Pa. 164, County of Crawford v. Nash, 99 Pa. 253; McCormick v. Fayette County, 150 Pa. 190, 24 A. 667; Sefler v. Borough of McKees Rocks, 72 Pa. Superior Ct. 81. (Emphasis in original.)

*McKinley, supra* at 292-93, 118 A.2d at 139.
*See Carson v. City of Philadelphia,* 28 Pa. D. & C. 413 (1936); *see also City of Philadelphia v. Houlihan,* 37 Pa. D. & C. 29 (1940). More recently, the Bucks County Common Pleas Court concluded that Article III, Section 27 did not prohibit the district attorney from receiving an increase in salary during his present tenure in office. In *Commonwealth ex rel. v. Corrigan,* 75 Pa. D. & C.2d 533, 537 (1976), the county commissioners adopted an ordinance after the incumbent's appointment which made the office full-time as well as increased the compensation. Citing *Baldwin* and *Emmaus Taxpayers' League v. East Penn Union School District,* 12 Pa. D. & C.2d 103 (1957), the court concluded that an "act or resolution of the county commissioners did not constitute a law under the purview of this section of the Constitution." *See also Commonwealth ex rel. Biehn v. Corrigan,* 29 Bucks 171 (1976).[29]

---

[29] Appellees cite us to *Harrington v. Carroll,* 428 Pa. 510, 239 A.2d 937 (1968), *citing Addison Case,* 385 Pa. 48, 122 A.2d 272

We conclude, therefore, that Bill No. 2357, adopted by the City Council of Philadelphia on December 20, 1979, does not violate either the express or implied intent of Article III, Section 27 of the Pennsylvania Constitution.

### B. *Statutory Prohibition: Act of 1927*

The Act of May 13, 1927, P.L. 992, *as amended*, 53 P.S. §13403, provides that "[n]o city, borough, town or township shall hereafter increase or diminish the salary, compensation or emoluments of any elected official after his election." The Charter provisions provide for councilmanic compensation "from time to time" and "until the Council shall otherwise ordain" for the other elected officials. Judge MARUTANI held that the post-election salary prohibition can be read together with the Charter's time provisions, and does *not* create the "irreconcilable conflict" required by Section 11, 53 P.S. §13111, of the First Class City Home Rule Act. The result: Pay raise ordinances may only be approved before the General Election. However, in the event there is a conflict, Judge MARUTANI concluded that the proposed pay increase is a strictly local concern within the meaning of Section 18, 53 P.S. §13133, of the Home Rule Act, making the Act of 1927 inapplicable to Philadelphia. Judge LORD, however, concluded that the Act of 1927 is both "inconsistent *and* in conflict" with the Charter. In such a case, the Home Rule Act mandates that the Charter prevail. We agree with Judge LORD's reasoning.

The lower court set the stage for this issue with a twofold question:

---

(1956), for the proposition that the Charter constitutes legislation analogous to a statute of the legislature. Although the Charter is "inflexible law" concerning the government of Philadelphia, its status in that regard does not affect our treatment of Article III, Section 27 of the Constitution.

First, is the Act of 1927 'inconsistent with or in conflict with' §§2-100, 3-600, or 1-101 of the Home Rule Charter, within the meaning of §11 of the Home Rule Act? If the answer is that there is no conflict, then the provisions of the Act of 1927 must apply.

However, if there is a conflict—and only if a conflict is found to exist—then we reach the second question: Are the provisions of the Act of 1927 '[a]pplicable in every part of the Commonwealth' or 'to all the cities of the Commonwealth' within the meaning of §18 of the Home Rule Act? If the provisions are so 'applicable,' then the limitations of §18 of the Home Rule Act would apply to the case presently before us.[30]

---

[30] Section 11, 53 P.S. §13111, expressly charges the City with its power over existing laws:

Any new charter or amendments to the charter of a city thus proposed, which are approved by a majority of the qualified electors voting thereon, shall become the organic law of the city at such time as may be fixed therein and all courts shall take judicial notice thereof. So far as the same are consistent with the grant of powers and the limitations, restrictions and regulations hereinafter prescribed, they shall supersede any existing charter and all acts or parts of acts, local, special, or general, affecting the organization, government and powers of such city, to the extent that they are inconsistent or in conflict therewith. All existing acts or parts of acts and ordinances affecting the organization, government and powers of the city, not inconsistent or in conflict with the organic law so adopted, shall remain in full force.

However, Section 11 is subject to the limitations set by Section 18, 53 P.S. §13133:

Notwithstanding the grant of powers contained in this act, no city shall exercise powers contrary to, or in limitation or enlargement of, powers granted by acts of the General Assembly which are—

. . . .

(b) Applicable in every part of the Commonwealth.

(c) Applicable to all the cities of the Commonwealth.

Appellants argue that Judge MARUTANI's interpretation of the Charter provisions as consistent with the 1927 Act conflicts with the plain meaning, intent, and interpretation of the Charter, as well as the policy behind home rule and the Home Rule Enabling Act. Upon careful review, we agree.

The Act of 1927 clearly and concisely prohibits *any* post-election increases for the City's elected officials. The Charter, on the other hand, allows councilmanic salary increases "from time to time" and pay raises for other elected officials as "Council shall otherwise ordain." Since Section 11 gives the Charter priority over all inconsistent, existing laws affecting the organization, government, and powers of the City, the language is most important.

These time phrases can mean one of two things. Judge MARUTANI construes the Charter to forbid Council increases only *after* election by reading Section 2-100's "time to time" provision as reconcilable with the Act of 1927's strict prohibition, while no consideration was paid to Section 3-600 concerning the salaries of the other officers. Judge LORD points out that such a subtle distinction could not support the conclusion,

> Can there be any doubt that if it were not for the Act of 1927 the subject Ordinance would be upheld? It is the conflict between these sections of the Charter and the Act of 1927 which brings the case before us. These sections of the Charter standing alone compel one result. The statute demands an opposite result[,]

and was never intended by a Charter Commission which clearly rejected specific limitations on the Council's compensation powers.

The record is clear on this account. Draft one of the Charter provided that "Each councilman shall receive a salary of $——————— per annum" while the

Mayor's salary followed the 1919 Charter providing that his salary could not be "increased or diminished during the term for which he shall have been elected." Draft two placed the post-election restriction on council members,

Each councilman, except the President of Council, shall receive a salary at the rate of $7,500 per annum, or such other sum as the Council shall from time to time ordain, and the President of Council shall receive in addition one thousand dollars per annum, *but no change in a councilman's rate of compensation shall be effective during the term for which he shall have been elected* (emphasis added);

but combined the Mayor's provision with that relating to other elected officials and removed the restriction. Identical to the second effort, draft three merely increased councilmanic salaries to $9,000 per year. However, the fourth and final draft removed the prohibition against Council members, and thus created the present controversy. Although we recognize that "caution must be exercised in using the action of the legislature on proposed amendments as an interpretative aid," 2A Sutherland's Statutes and Statutory Construction, §48.18,. (4th ed. C.D. Sands 1973); *see Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 381 n. 11 (1969), the Charter Commission drafts indicate at least an understanding and awareness of the statutory prohibition. However, the transition from draft two to the final version, demonstrates a clear intent on the part of the framers to authorize Council to increase the salaries of elected officers at its discretion, without regard to time.[31]

---

[31] Appellants also point out that the 1979 Ordinance is not unique in its post-election action. Twice during the administration of the late Mayor Richardson Dilworth, effective January 1, 1957, for the 1956-1960 term and January 1, 1961 for the 1960-1964 term,

In resolving this question in favor of peaceful co-existence, Judge MARUTANI refers to the Statutory Construction Act of 1972 for the proposition that repeals by implication are not favored by the law unless there exists an "irreconcilable repugnancy" between statutes embracing the same subject matter. *Citing Parisi v. Philadelphia Zoning Board of Adjustment,* 393 Pa. 458, 143 A.2d 360 (1958), and *Kelly v. Philadelphia,* 382 Pa. 459, 115 A.2d 238 (1955).

Initially, we can discern little reason for the lower court's application of the Statutory Construction Act to the provisions of the Charter.[32]   In *Parisi,* the issue concerned whether the Supreme Court's prior interpretation of the Philadelphia Zoning Ordinance of August 10, 1933 and the Enabling Act of May 6, 1929, P.L. 1551, was consistent with the Philadelphia Zoning Code of October 11, 1956, in determining whether a car wash was a permitted use.   In the more relevant *Kelly* case, the Supreme Court was asked to decide whether Charter provisions setting procedural requirements for the adoption of zoning ordinances were so inconsistent as to supersede and repeal those found in the Zoning Ordinance Enabling Act of 1929. Although the Court found the Act not repealed by implication, we note several crucial distinctions. While both touch upon the same subject matter, the Act not only is the executing and enabling legislation

and once during the term of former Mayor James H. J. Tate, effective January 1, 1968 for the 1968-1972 term, increases were made during term. We recognize, of course, that this type of historical argument cannot serve as support for our decision.

[32] *See* Statutory Construction Act of November 5, 1972, P.L. 707, 1 Pa. C. S. §1501 *et seq.* While the act was never drawn to concern home rule charters, 1 Pa. C. S. §1502(a)(1)(ii), we have examined its guidelines in *City of Philadelphia v. Kenny,* 28 Pa. Commonwealth Ct. 531, 546, 369 A.2d 1343, 1351-52 (1977). We must conclude, however, that the statutory construction provisions do not facilitate a harmonious reading of the Act of 1927 and the Charter.

behind local zoning control, but embraces a fairly comprehensive guide for municipal ordinances. The Charter is thus subordinate in this regard to the General Assembly's enabling law. Here, we are confronted with an act of the legislature which specifically conflicts with authorized provisions of the Charter.

Appellees offer further support for the proposition that the Charter and the 1927 Act must be read together, however, both citations examine and compare acts of the legislature rather than an act of the Legislature and an ordinance of Council. In *Cummings v. Scranton*, 348 Pa. 538, 36 A.2d 473 (1944), the Court reconciled two sections of the Second Class City Code blocking Scranton City Council's attempt to raise the salaries of certain city employees. The Court ruled that a Second Class A City Council's power to set salaries "from time to time" (53 P.S. §9495, now 53 P.S. §22225), for all non-elected city officials and employees did not permit spending beyond the annual general appropriation ordinance (53 P.S. §9503, now 53 P.S. §22233) but that portions of the same regulatory statute were intended to convey a reasonable, consistent grant of power. In *Harris Appeal*, 154 Pa. Superior Ct. 659, 37 A.2d 21 (1944), the same conclusion was reached on a comparison between the Act of 1927 and Section 1023 of the General Borough Code of May 4, 1927, P.L. 519 (53 P.S. §12934, now §13403), which provided that the Chief Burgess' salary, when fixed by ordinance, could not be changed "during the term of the incumbent." Clearly, the Court concluded these statutes were capable of being read together without conflict.

Upon concluding that an irreconcilable conflict does exist between the Act of 1927 and the Charter, we must turn briefly to the policy of home rule before addressing Section 18 of the Home Rule Act.

Clearly, the intent of both the people of the Commonwealth and the General Assembly in creating home rule for Philadelphia was to formulate a special solution to a very unique problem. Home rule for Philadelphia was not just a logical progression in local self-government brought from a strange new land by an enlightened legislature. Home rule was postulated, designed, and effectuated to resolve the problems of over a century of dualistic county-city government—complex, outmoded, and politically and economically burdensome on both the people of the Commonwealth and the City. This is not to say that Philadelphia stands alone as a free and separate entity from the State, or that the Charter represents its Declaration of Independence, but rather where a conflict exists between the Charter and a statute on matters within the Charter's jurisdiction, the Constitution and the enabling Act demand that the Charter prevail.

Turning to Judge MARUTANI's alternative treatment of the First Class City Home Rule Act's Section 18, 53 P.S. §13133, we agree with the court below and conclude that the Act of 1927 is applicable to neither every part of the Commonwealth nor all the cities of the Commonwealth. In fact, our Supreme Court in *Lennox v. Clark, supra,* addressed the relationship between Section 18 and matters concerning strictly local interests when it explored the City Charter and its effect on former Philadelphia County offices after the City-County Consolidation Amendment:

> There seems to exist an erroneous impression . . . regarding section 18 of the Home Rule Act which forbids the city to exercise powers contrary to powers granted by acts of the General Assembly applicable in every part of the Commonwealth or to all the cities of the Commonwealth.

. . . [It is] abundantly clear that the limitations of power referred to in section 18 concern only laws in relation to substantive matters of State-wide concern, such as health, safety, security and general welfare of all the inhabitants of the State, and not to matters affecting merely the *personnel* and *administration* of the offices local to Philadelphia and which are of no concern to citizens elsewhere. Any other conclusion would reduce the Charter to a mere scrap of paper and make the much heralded grant of Philadelphia home rule an illusion and a nullity. (Emphasis in original.)

372 Pa. at 378-9, 93 A.2d at 845

Over the years, our courts have taken painstaking efforts to separate those matters of local concern[33] from those interests distinctly and irrevocably attached to the concerns of Pennsylvania citizens at large.[34] In fact, the interests of the Commonwealth of Pennsylvania have been found by our courts to draw their very existence from either the Constitu-

[33] These include zoning regulations for public schools, *School District of Philadelphia v. Zoning Board of Adjustment*, 417 Pa. 277, 207 A.2d 864 (1965), matters involving municipal officers, *Commonwealth ex rel. Truscott v. DiLauro*, 387 Pa. 506, 128 A.2d 348 (1957), disability compensation for Philadelphia policemen and firemen, *Ebald v. Philadelphia*, 7 Pa. D. & C. 179 (1956), *aff'd per curiam*, 387 Pa. 407, 128 A.2d 352 (1957), scope of judicial review over civil service appeals, *Addison Case*, 385 Pa. 48, 122 A.2d 272 (1956), water metering programs, *Vitacolonna v. Philadelphia*, 382 Pa. 399, 115 A.2d 178 (1955), and access to delinquent real estate tax records, *City of Philadelphia v. Doe*, 45 Pa. Commonwealth Ct. 225, 405 A.2d 1317 (1979).

[34] We refer to interim tax measures, *Mastrangello v. Buckley*, 433 Pa. 352, 250 A.2d 447 (1969), elections, *Cali v. Philadelphia*, 406 Pa. 290, 177 A.2d 824 (1962), access to public records, *Moak v. Philadelphia Newspapers, Inc.*, 18 Pa. Commonwealth Ct. 599, 336 A.2d 920 (1975), and rights guaranteed policemen and firemen, *Tate v. Antosh*, 3 Pa. Commonwealth Ct. 144, 281 A.2d 192 (1971).

tion or enactments of the legislature. When coupled with the haphazard prohibitions developed by the legislature for other political subdivisions, the years have not made the Act of 1927 any more of a matter of statewide concern. Indeed, the Act of 1927 has long been repealed as it affects cities of the second and third classes, townships of the first and second classes, and boroughs.[35] Hence, we must also conclude that the Act of 1927 does fall within the limitations established by the First Class City Home Rule Act.

---

[35] Section 2 of the Second Class City Code, Act of December 22, 1951, P.L. 1715, *as amended,* 53 P.S. §22224:

Councilmen of cities of the second class of this Commonwealth shall receive for their services during their term of service salaries, payable in monthly installments, not to exceed ten thousand dollars ($10,000) per annum.

Section 903 of the Third Class City Code, Act of June 23, 1931, P.L. 93, *as amended,* 53 P.S. §35903:

No city shall increase or diminish the salary, compensation, or emoluments of any elected officer after his election.

Section 603 of the First Class Township Code, Act of June 24, 1931, P.L. 1206, *as amended,* 53 P.S. §55603:

No township shall increase or diminish the salary, compensation or emoluments of any elected officer after his election. Appointed officers and employees of the township shall receive such compensation for their services as the township commissioners shall prescribe.

Section 515 of the Second Class Township Code, Act of May 1, 1933, P.L. 103, *as amended* by Section 2 of the Act of June 1, 1956, P.L. (1955) 2021, 53 P.S. §65515:

Supervisors shall receive . . . as compensation, not less than four dollars nor more than eight dollars for each meeting which they attend. The amount of the compensation for attending meetings shall be determined by the township auditors.

Section 1001 of the Borough Code of February 1, 1966, P.L. 1656 (1965), 53 P.S. §46001:

The councilmen may receive compensation to be fixed by ordinance at any time and from time to time as follows: [schedule of monthly stipend geared to population of the borough].

## C. Conflict of Interest

Viewing Council's vote after election for increases effective in the term of election, Judge MARUTANI barred *only* the councilmanic increases for the incumbent members voting their own raises and the remaining membership, so as to prevent the illogical creation of a two-tier compensation system. He then concluded that this public policy prevents councilmen from voting in favor of an ordinance which benefits them, even when the benefit is conferred upon all members in their official capacities, voting or not.[36] Only Judge KALISH would invalidate the *entire* ordinance because of Council's conflict of interest. We can assign merit to neither position.

In *Genkinger v. New Castle*, 368 Pa. 547, 551-52, 84 A.2d 303, 305-06 (1951), our Supreme Court articulated the common law principle:

> *It is a well and wisely established principle of public policy in Pennsylvania that a public official may not use his official power to further his own interests.* This principle originated in the common law and has become embodied in the Constitution of Pennsylvania and has been declared to be the policy of this state in many Acts of Assembly: [cases and authorities cited.] The reasons for this must be obvious—a man cannot serve two masters at the

---

[36] Judge MARUTANI seems to draw support from a 1975 Philadelphia Common Pleas Court decision enjoining the Mayor and all Council members from receiving salary increments, effective December 14, 1973, during the balance of their current terms. The Honorable JAY H. EISEMAN concluded that these officials, acting in their official capacities, could not be permitted to benefit from their own acts. *The Committee of Seventy v. Schwartz*, Nos. 6143 and 5744, July Term, 1974 (August 20, 1975). However, we note that Judge EISEMAN also concluded that neither the Constitution nor the Act of 1927 prohibits the proposed increases.

same time, and *the public interest must not be jeopardized by the acts of a public official who has a direct pecuniary or personal or private interest which is or may be in conflict with the public interest.*

. . . [T]he prohibition is so strictly enforced that if the measure is passed by the vote of one or more persons who have a direct private interest therein, no matter how beneficial the ordinance may be, it is void: [cases and authorities omitted.] (Emphasis in original.)

*See also Commonwealth ex rel. McCreary v. Major,* 343 Pa. 355, 22 A.2d 686 (1941), and *Commonwealth v. Raudenbush,* 249 Pa. 86, 94 A. 555 (1915).

The appellants-officials respond that the common law principles concerning conflicts of interests must be pre-empted by the constitutional and legislative mandates of home rule and municipal self-government. They contend that the General Assembly, by the terms of the First Class City Home Rule Act, has declared that the Charter is supreme, subject to the Constitution, and that pay increases promulgated thereunder cannot violate the public policy of the Commonwealth. We agree.

In *Genkinger,* where Council members voted in favor of a retirement pension ordinance which tailored individual provisions to particular members, the Court determined:

The City Ordinance (1) went, as we have seen, far beyond anything authorized by and in some *respects conflicted with the* Act of Assembly (which authorized this type of ordinance), and (2) was fundamentally contrary (a) to the public policy of Pennsylvania, and (b) to the purpose of a retirement or pension system; and (3) in important pension provisions directly benefited four of the five Coun-

cilmen in a manner and to a degree *unauthorized by the Act of Assembly.* (Emphasis and explanation added.)

*Genkinger, supra* at 552-53, 84 A.2d at 306.

In effect, the self-imposed benefits were not conferred upon the councilmen in their capacities as councilmen but on individuals as retired pensioners. In *Major,* four councilpersons voted themselves membership on the municipal authority board, while in *Raudenbush* a borough councilman, elected by council to the Office of Water Works Superintendent, presented his council resignation to the borough council, and voted with the 8 to 7 majority which accepted his resignation. In each of these cases, a councilman attempted to utilize the official position in an unauthorized manner for clearly personal gain. In each case, the local officers used their official powers above and beyond any enabling legislation—statute, charter, ordinance or otherwise.

To invalidate the pay increases on these public policy grounds, we must find that the council members not only voted a personal or pecuniary interest to themselves, but that they overstepped legislative authorization in doing so. Although we recognize that some council members voted raises for themselves at a time when it had been determined who the individual beneficiaries would be, we conclude that the compensation vests *with the office* and not the individual. This is more startlingly apparent when four lame duck members vote increases for nine newly elected members who had opposed the incumbents.[37] In our opinion, this alleged personal or pecuniary interest has no bearing upon a first class city's power and ability to rule itself. Even without the existence of home rule in Philadelphia, we ask what body is

---

[37] *See* n. 2, *supra.*

more qualified to both assess and react to the ravages of inflation upon city government salaries than City Council, whose function is essential to the operation of the city.[38]

Our review of the record reveals that the proposal and subsequent passage of the compensation ordinance was neither an ill-conceived nor clandestine, 13th hour device utilized by City Council to avoid public scrutiny of its intentions to increase councilmanic salaries. Rather, there was extensive discussion at a public hearing conducted by a committee of the whole Council wherein public and professional consultants testified and private citizens registered their objections to the proposed increases, all leading to an informed and considered decision.[39]

Concerning legislative authorization, Appellants suggest that since the lower court presumed authority, no conflict of interest could thereafter be found. Although this argument is tenuous at best, the fundamental issue is whether Council was authorized by the Charter and the First Class City Home Rule Act to vote the increases, regardless of the timing. We repeat our previous findings and conclude that for incumbent and newly elected Council members, the Mayor, City Controller, and Clerk of the Court of Quarter Sessions, Oyer and Terminer and General Jail Delivery, Council had both the power and authority to act, and did so properly.

---

[38] See United States v. Will, U.S. , , 101 S.Ct. 471, 478 (1980), wherein Chief Justice BURGER notes that inflation must be considered when setting a public official's salary. Of interest is the Chief Justice's observation that such is the case not only today but was at issue at the Constitutional Convention of 1787.

[39] Public hearing on Bills 2357 and 2396 was conducted on December 5, 1979, before a committee of the whole Council.

### Epilogue

The foregoing events as evidenced by these legal pronouncements document the efforts of an adolescent city to match the orderliness of its colonial ancestor. Our unique system of government more frequently than not creates its own obstacles—the frequency of the elective process and the people turnover in the separate branches of this political phenomenon thwarts a sound systematic continuity of thought and translation into certain dogma.

This Court has today by comprehensive research and analysis arrived at a resolution of the present conflicting issues. This decision does not resolve the problems which have been uncovered here. Philadelphia, by its leadership in the Executive and Legislative Branches of its self rule style must move to close the gaps we have discovered. Until that is accomplished, litigation will continue to plague city reformation.

Accordingly, we

### Order

The Philadelphia Common Pleas Court Decree dated May 15, 1980, is affirmed insofar as it restrains and enjoins the Sheriff, City Commissioners, Register of Wills, and District Attorney of Philadelphia from accepting or receiving any increments in salary or benefits set forth in or arising from the City Council Ordinance No. 2357 dated December 24, 1979. However, the Decree is reversed insofar as it restrains and enjoins the Mayor, City Controller, Clerk of the Court of Quarter Sessions, Oyer and Terminer and General Jail Delivery, and all members of the City Council of Philadelphia from accepting and receiving their legally authorized compensation. The City's Director of Finance and Treasurer are hereby au-

thorized to effectuate the mandates of this Court's Order.

Judge WILKINSON, JR., did not participate in the decision in this case.

---

DISSENTING OPINION BY JUDGE BLATT:

I must respectfully dissent. I believe that the majority opinion unfortunately overlooks well-established common law principles and creates a regrettable precedent for the self-aggrandizement of municipal officers which should not be allowed to stand.

## I. Conflict of Interest

The central fact of this case is that, after their re-election on November 6, 1979, several members of Philadelphia City Council participated in a vote to establish a pay raise for all city council members and certain other city officers, with these raises to become effective on January 7, 1980, and, of the twelve council members who voted for this ordinance, eight had been re-elected to office and were therefore aware at the time of the vote that the raises would accrue to their direct, personal benefit.

It has long been an unquestioned rule of the common law that public officials cannot participate in votes or decisions in which they have a direct and anticipated pecuniary interest above that of the citizenry in general. When, in *Genkinger v. New Castle*, 368 Pa. 547, 552, 84 A.2d 303, 306 (1951), our Supreme Court held void the action of a city council in voting to establish a retirement plan which directly benefitted some council members, it said:

> The reasons for [the prohibition] must be obvious—a man cannot serve two masters at the same time, and the public interest must not be jeopardized by the acts of a public official who

has a direct pecuniary or personal or private
interest which is or may be in conflict with
public interest. (Emphasis omitted.)

Similarly, in *Reckner v. German Township School
District,* 341 Pa. 375, 19 A.2d 402 (1941), the Court
struck down an interim raise for a school board mem-
ber after the interested party had participated in the
vote. *See also Raynovich v. Romanus,* 450 Pa. 391,
299 A.2d 301 (1973) ; *Meizell v. Hellertown Borough
Council,* 370 Pa. 420, 88 A.2d 594 (1952) ; *Common-
wealth v. Raudenbush,* 249 Pa. 86, 94 A. 555 (1915) ;
*Cotlar v. Warminster Township,* 8 Pa. Common-
wealth Ct. 163, 302 A.2d 859 (1973).

The majority opinion attempts to avoid these
precedents, of course, by declaring that the increased
compensation vests *with the office,* not with the indi-
vidual officeholders. Yet eight of the voting council
members had already been re-elected to office at the
time of the vote; thus, just as these council members
were vested with another four years in office, so also
were they vested with the increased compensation for
which they voted. The attempts of the majority to
distinguish the facts of the present case from those
of these controlling precedents are unpersuasive, for
the reasoning underlying these precedents applies
just as well here: public officials may not vote on a
law or ordinance if they have a personal interest in
the outcome of the vote.

## II. Statutory Construction

Besides an impermissible conflict of interest under
common law principles, we must consider Article III,
Section 27 of the Pennsylvania Constitution which
provides: ''No law shall extend the term of any public
officer, or increase or diminish his salary or emolu-
ments, *after his election* or appointment.'' (Em-
phasis added.) While this provision alone would

clearly seem to forbid the council's post-election pay raise for both council members and other city officials, the appellants argue that a municipal ordinance does not constitute a "law" as contemplated by this section of the Constitution. It seems to me that this proposition is obviously suspect, especially in view of other constitutional provisions which forbid "laws" in the following circumstances: "preference . . . to any religious establishment,"[1] restraining the right "to examine the proceeding of the Legislature,"[2] "ex post facto law[s],"[3] "impairing the obligation of contracts,"[4] "attain[der] of treason or felony,"[5] or, denial of equal rights "because of . . . sex,"[6] which have traditionally been applied to local government ordinances as well as state statutes.

The majority's basis for its narrow construction of the term "law" is the case of *Baldwin v. City of Philadelphia*, 99 Pa. 164 (1881), which held that an ordinance of the Philadelphia city council then was not a "law" for the purpose of this constitutional section. Almost 100 years have passed since the decision in *Baldwin*, however, and these years have seen drastic changes in the scope and effect of Philadelphia ordinances, particularly since the passage of the Home Rule Charter and the cases decided in the general area of state and local government interrelationships. The continued viability of *Baldwin, supra*, would therefore be at least questionable.

Municipal corporations, such as cities, are established by the Commonwealth and operate as its agencies. *Washington Arbitration Case*, 436 Pa. 168, 259

---

[1] Pa. Const. art. I, §3.
[2] Pa. Const. art. I, §7.
[3] Pa. Const. art. I, §17.
[4] Pa. Const. art. I, §17.
[5] Pa. Const. art. I, §18.
[6] Pa. Const. art. I, §28.

A.2d 437 (1969). And, while the First Class City Home Rule Act[7] authorizes the City of Philadelphia to legislate as to municipal functions as fully as could the Legislature, it is only logical to assume that this grant of authority cannot operate to give the City of Philadelphia *more* power than the Legislature itself has over such affairs. Yet Section 17 of The First Class City Home Rule Act, 53 P.S. §13131, expressly provides that the Home Rule Charter may not be "inconsistent with the Constitution of the United States or of this Commonwealth," and it seems to me that *Baldwin, supra,* may be based, therefore, on an overly narrow construction of the term "law". I believe this because Article III, Section 27 of the Constitution would clearly prohibit the Legislature itself from passing a "law" increasing the salary of municipal officials after their election, and just as clearly it would prohibit it from passing a law which would authorize municipal officials to pass an "ordinance" increasing their salaries after their election. To hold otherwise, it seems to me, is clearly to circumvent the constitutional prohibition.

Even assuming, however, that the ordinance here was not a "law" as contemplated by Article III, Section 27 of the Constitution, we must remember that the Legislature, perhaps in response to *Baldwin, supra,* has applied the rationale of that provision in laws authorizing changes in compensation from municipal officeholders in other municipalities. A review of these laws reveals that the Legislature has specifically prohibited post-election pay raises in many cases, and, in cases where statutes have been silent as to such increases, the common law concerning conflict

---

[7] Act of April 21, 1949, P.L., *as amended,* 53 P.S. §13101 *et seq.*

of interest had nevertheless been held to prohibit such pay raises.[8]

The Act of May 13, 1927 (Act of 1927) P.L. 992, *as amended,* 53 P.S. §13403, provides that "[n]o city . . . shall hereafter increase or diminish the salary, compensation or emoluments of any elected officer *after his election."* (Emphasis added.) The majority argues that the Philadelphia Home Rule Charter provides only that "[e]ach councilman shall receive a salary at the rate of . . . such . . . sum as the Council shall from time to time ordain. . . ." Home Rule Charter §2-100,[9] and that this provision governs here. Yet, if the provisions of the Charter and an enactment of the Legislature are inconsistent, then they argue that the Charter provision prevails pursuant to Section 11 of the First Class City Home Rule Act, 53 P.S. §13111.

Here, it would seem to me that the general common law principles of statutory construction are ap-

___

[8] Salary increases after an election are specifically prohibited in Section 903 of the Third Class City Code, Act of June 23, 1931, P.L. 932, *as amended,* 53 P.S. §35903.

There is no express prohibition against post-election pay increases in: Section 2 of the Second Class City Code, Act of December 22, 1951, P.L. 1715, *as amended,* 53 P.S. §22224; Section 515 of the Second Class Township Code, Act of May 1, 1933, P.L. 103, *as amended,* 53 P.S. §65515.

Only Section 1001 of the Borough Code, Act of February 1, 1966, P.L. (1965) (1656, *as amended,* 53 P.S. §46001, provides that council members may fix their compensation "at any time and from time to time," which is presumably the construction of the Home Rule Charter language (*i.e.* "from time to time") urged by the city council. Even if the language of the Home Rule Charter were so intended, however, we are unaware of any controlling precedent which has permitted a vote by a borough council to change its compensation *after the election.* The only case cited as precedent in this respect is that of *Appeal from Baden Auditor's Report,* 21 Beaver 128 (1959). This, of course, is not controlling.

[9] 351 Pa. Code §2.2-100.

plicable[10] and would dictate a contrary result. For, because the Act of 1927 specifically prohibits pay raises *after* an election and the Home Rule Charter neither authorizes nor forbids post-election raises, the common law maxim of ejusdem generis requires that the specific prohibition of the Act of 1927 shall operate as a limitation on the general language of the Home Rule Charter. I am unable, therefore, to see any inconsistency or repugnance between the two provisions. I believe that the majority opinion subverts the principles of statutory construction to find such an inconsistency and that, by reading the Home Rule Charter language that the city council can order pay raises "from time to time" to mean that it can do so "at any time", the majority violates the settled presumption against the implied repeal of statutes. *See Parisi v. Philadelphia Zoning Board of Adjustment,* 393 Pa. 458, 143 A.2d 360 (1958); *Kelly v. Philadelphia,* 382 Pa. 459, 115 A.2d 238 (1955).

## Conclusion

I believe that, because eight re-elected council members voted in favor of Bill 2357 although they had a direct personal interest in its passage, and because their vote to raise other salaries than their own was prohibited by the Act of 1927, Bill 2357 should be declared void in its entirety.

Judge CRAIG joins in this dissent.

---

[10] As the majority opinion points out, the Statutory Construction Act of 1972, 1 Pa. C. S. §1501 *et seq.,* is not applicable to the construction of statutes as they affect home rule charter documents. Section 1502(a)(1)(ii) of the Statutory Construction Act of 1972, 1 Pa. C. S. §1502(a)(1)(ii).